**In re SUPERNATURAL FOODS, LLC, Debtor.**

**Dwayne Murray, Chapter 7 Trustee for the Estate of Supernatural Foods, LLC, Plaintiff,**

**v.**

**Franke–Misal Technologies Group, LLC, et al., Defendants.**

**Bankruptcy No. 01–10403.**
**Adversary No. 01–1014.**

United States Bankruptcy Court, M.D. Louisiana.

Oct. 17, 2001.

Paul Douglas Stewart, Jr., Baton Rouge, Louisiana, for Dwayne M. Murray, Trustee.

Edna A. Latchem, Baton Rouge, Louisiana, Howard C. Meyers, Phoenix, Arizona, for defendants.

## REASONS FOR PARTIAL SUMMARY JUDGMENT

LOUIS M. PHILLIPS, Bankruptcy Judge.

Before the Court are cross-motions for summary judgment filed on behalf of the Plaintiff, Dwayne Murray ("Trustee"), Chapter 7 Trustee for the bankruptcy estate of SuperNatural Foods, LLC ("SNF"),[1] and on behalf of the Defendants, Franke–Misal Technologies Group, LLC ("Franke–Misal") and Henry L. Franke ("Franke"). After considering the applicable law, extensive briefing of the parties, and the arguments set forth at oral argument, the Court, for the reasons that follow (which incorporate and supplement the oral reasons given in open court), grants the Trustee's Motion for Summary Judgment, and denies Franke–Misal's Motion for Summary Judgment.[2] As a result, the Court determines that the exclusive license agreement of certain patented technology between Franke–Misal and SNF did not expire prior to the filing of the bankruptcy case, and thus is assumable. And further, that the Trustee is not prevented from

assuming and assigning the Agreement by 11 U.S.C. § 365(c)(1), should the Trustee be practically able to assume the Agreement.

## I. FACTUAL BACKGROUND

Henry Franke is the inventor of several processes utilized in the extraction of fats and oils from various foods. As a result of these inventions, Franke applied for, and received, patents issued by the United States Patent and Trademark Office.[3]

After receiving the various patents, Franke assigned his interests in the patents to University Research and Marketing, Inc. ("URM"). URM is a closely held corporation owned, at least in part, by Franke. URM then entered into an agreement with Franke–Misal, whereby URM granted Franke–Misal "the exclusive right to make, market, and sell products using the [patented processes]."[4]

Thereafter, Franke–Misal attempted to commercialize the patented processes, and entered into an agreement with SNF, whereby Franke–Misal granted SNF "an exclusive license [of the patented processes] to make, have made, use, sell and import licensed products in the Territory."[5] In return, SNF agreed to put the processes to commercial use and to pay an agreed upon royalty to Franke–Misal.[6]

---

1. By Order of this Court, Dwayne Murray, as trustee for the SNF bankruptcy estate, was substituted as party plaintiff in place of the original plaintiffs.

2. For ease of reference, due to the allied nature of Franke–Misal and Franke, the Court, throughout these Reasons will refer in many cases to Franke–Misal only, but as inclusive of the rights and position of Franke as well.

3. In addition, Franke applied for patents on his processes from the European Patent Office and from the Canadian Patent Office.

4. *See,* License Agreement, dated May 20, 1997, attached as Exhibit F to the Affidavit of Henry Franke.

5. *See,* License Agreement, dated May 17, 1999, ¶ 2.1, attached as Exhibit G to the Affidavit of Henry Franke. As this agreement forms the cornerstone of the instant litigation, the Court will hereinafter refer to this License Agreement as the "Agreement." The patents specifically covered by the Agreement are U.S. Patent No. 5,281,732, U.S. Patent No. 5,525,746, U.S. Patent No. 5,728,851, U.S. Patent No. 5,739,364, and European Patent No. EP 93 903 394 0–2103.

6. In addition, the Agreement contains provisions under which SNF would agree to enter

The Agreement was restricted to certain defined categories of foods, specifically "snack foods" and "cheese."[7] The Agreement purported to extend, territorially, to all of the United States, the European Union, Canada, and Mexico.[8]

As promising as the non-fat snack food and cheese market appears, SNF has, to this point, been unsuccessful in commercializing the patented processes. As a result, SNF encountered difficulties in paying the amounts due Franke–Misal and Franke under the Agreement. On December 11, 2000, Franke, on behalf of Franke–Misal, sent a letter, via facsimile and Federal Express, to Arthur Cooper, CEO of SNF, detailing defaults under the Agreement.[9] Apparently SNF did not address the issues raised in the December 11, 2000 letter because on January 31, 2001, Franke again sent a letter to Mr. Cooper, and again by facsimile and Federal Express, detailing not only the previous defaults but listing other perceived defaults as well.[10] In the letter, Franke–Misal declared the

Agreement had terminated pursuant to its provisions—specifically the failure to cure defaults within thirty days of notice.[11]

In addition to sending the January 31, 2001 letter by facsimile and Federal Express, Franke–Misal also sent a copy of the letter via certified mail, return receipt requested. SNF received the copy sent via certified mail on February 5, 2001.

After receiving the default letter via certified mail, SNF apparently did not cure the purported defaults. As a result, on March 5, 2001, several minority members of SNF filed an involuntary petition against SNF under Chapter 7 of the Bankruptcy Code.[12] The Court issued an Order for Relief on May 2, 2001.

Contemporaneous with the filing of the involuntary petition, the petitioning creditors (minority members of SNF) also filed a complaint seeking a declaratory judgment that the Agreement had not terminated pre-petition.[13] After the Trustee

---

into a consulting agreement with Franke. *See*, Agreement, ¶ 3.2(b). In addition to the consulting contract, SNF agreed to allocate its royalty payments due under the Agreement towards both use of the patented processes themselves and for "Licensed Know-How," defined by the agreement as confidential information possessed by Franke–Misal regarding the patented processes. All royalty payments were to be allocated 75% to the Licensed Know-How, and 25% to the patented processes.

7. "Snack foods" is defined by the Agreement as "potato chips, corn chips, tortilla chips, cheese puffs, party mix, multi-grain chips, onion rings, bagel chips, potato sticks." *See*, Agreement, ¶ 1.5. The term "cheese" is not defined by the Agreement. *Id.*

If, however, SNF was ultimately successful in its commercialization of the patented processes, SNF could, for the payment of additional royalties and fees, extend the Agreement to cover additional categories of foods such as cocoa, nuts, fish, meats, and any other products for which the patented processes might work. *Id.* at ¶ 7.1.

8. *Id.* at ¶ 1.11

9. *See*, Exhibit F to Franke–Misal's Statement of Facts Supporting Motion for Summary Judgment.

10. *See*, Exhibit G to Franke–Misal's Statement of Facts Supporting Motion for Summary Judgment.

11. *See*, Agreement, ¶ 8.1.

12. 11 U.S.C. §§ 701, *et seq.* "Bankruptcy Code" refers in general to those statutes codified at 11 U.S.C. §§ 101, *et seq.* All references to statutes are to Title 11, United States Code unless otherwise denoted.

13. In addition, the Complaint requested declaratory judgment regarding the lease of certain personal, movable property used in the manufacture of snack foods. The Partial Summary Judgment rendered herewith does not extend to this claim.

was substituted as a party plaintiff, the Trustee and Franke–Misal filed cross-motions for summary judgment on the issue of whether the Agreement terminated pre-petition.

At the hearing on the motions, the Court intimated that § 365(c) may have some bearing on the ultimate outcome of the suit, *i.e.*, if applicable non-bankruptcy law prohibited assumption and/or assignment of the Agreement, the declaratory judgment requested by the present suit would be moot. Thus, the Court requested supplemental briefing on the matter, and rescheduled the hearing.

After considering the pleadings, memoranda, and argument of the parties, and the applicable law, the Court determines that it has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and that it has final authority jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A), (O). For the reasons that follow, the Court finds: (1) the Agreement did not terminate pre-petition; and (2) applicable non-bankruptcy law does not prohibit the assumption and assignment of the Agreement by the Trustee, and that Partial Summary Judgment in favor of the Trustee is appropriate.[14]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, affidavits, depositions, and other documents within the record disclose that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[15] An issue of material fact is genuine only if resolution requires a trier of fact to weigh evidence, witness credibility and draw inferences therefrom.[16] In this instance, the parties have not submitted a dispute regarding issues of material fact. The Court determines that there are no genuine issues of material fact and that the questions presented by the pleadings raise only legal issues. Since disposition of the legal issues will necessarily decide the case, partial summary judgment is appropriate.

## III. PRE–PETITION TERMINATION OF THE AGREEMENT

The legal issue at the core of the instant dispute is one purely of contractual interpretation. That is, the Court must construe the relevant termination provisions in the Agreement.

■ In the absence of controlling federal bankruptcy law, interests of the debtor in property are determined by reference to state law.[17] In this case, the interest of the debtor in property as of the commencement of this bankruptcy case is placed squarely before the Court through the request by the Trustee to declare that the debtor's rights under the Agreement

---

**14.** Franke–Misal has asserted various counter-claims in this matter, such as a declaration that the Agreement had indeed expired prior to the filing of the petition, the right to an accounting, and the right to have the debtor and Trustee turn over property. In addition, Franke–Misal has asserted many allegations which, if true, would form the basis for fraud cause of action. At this juncture, however, the Court does not rule on anything but the pure request for a declaratory judgment (requested by both parties). The accounting and turnover counterclaims, as well as the allegations of fraud, are reserved for such time as the Trustee actually seeks to assume the Agreement.

**15.** Fed.R.Civ.P. 56(c); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

**16.** *See, Taita Chem. Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir.2001).

**17.** *Butner v. United States*, 440 U.S. 48, 55–56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).

had not terminated and the request by Franke–Misal that it had terminated, as of the moment of the commencement of the case.[18] Therefore, the Court must construe the Agreement according to Louisiana law in determining whether the Agreement terminated prior to the filing of the involuntary petition, and thus, whether the estate obtained any interest in the Agreement as of the petition date.

 Under Louisiana law, "[i]nterpretation of a contract is the determination of the common intent of the parties."[19] Further, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[20] Moreover, Louisiana law requires that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[21] Finally, "a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight."[22]

Against the backdrop of these interpretative principles, we look at the contract. The undisputed facts establish, generally, that Franke–Misal attempted, pre-petition, to cancel or terminate the Agreement due to purported defaults on the part of SNF, pursuant to the contract's termination clause. The termination provision is located in Paragraph 8.1 of the Agreement, and states:

(a) This Agreement may be terminated by one of the parties (hereinafter "Aggrieved Party") in the event that the other party (hereinafter "Defaulting Party") is in default of its obligations under this Agreement, and if after notice, *as provided for hereinbelow*, the Defaulting Party has failed to cure the breach within thirty (30) days of receipt of notice of the breach.

(b) Upon learning of a breach of this AGREEMENT [sic], the Aggrieved Party *shall by certified mail, return receipt requested*, notify the Defaulting Party that it is in breach of this Agreement, and in said notice shall provide sufficient detail so that the Defaulting Party is aware of the nature of the default.[23]

 Both parties, in pleadings and at oral argument, assumed that the Agreement would have been terminated automatically upon the passage of thirty days after the receipt of notice. The issue as framed by the parties, therefore, was whether the thirty days began to run from the date of the first notice, or from the date of the receipt of the letter sent via certified mail, return receipt requested. The Court, however, interprets the contract differently from the construction given by the parties.

The termination provision of the Agreement states that the contract *"may be terminated"* by a party if the other party

---

**18.** *C.f., Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Management, Inc.)*, 4 F.3d 1329, 1334 (5th Cir.1993) (Bankruptcy Court properly determined estate's interest under contracts by reference to Louisiana state law.).

**19.** La. Civ.Code art.2045.

**20.** La. Civ.Code art.2046.

**21.** La. Civ.Code art.2050.

**22.** *Amoco Production Co. v. Texas Meridian Resources Exploration, Inc.*, 180 F.3d 664, 668–669 (5th Cir.1999), quoting *Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir.1998).

**23.** (emphasis added).

is in default and fails to cure the default within thirty days of notice.[24] On the issue of notice, the provision states, "and if after notice, *as provided for hereinbelow* . . ."[25] The "hereinbelow" reference is to Paragraph 8.1(b) of the Agreement, which provides, unequivocally, that notice is to be given "by certified mail, return receipt requested."[26] Taken together, the termination provision of the Agreement provides that if a party is in default, the other ("aggrieved") party may send a notice to the party in default, which, if the notice was sent via certified mail, return receipt requested, would entitle the aggrieved party to effectuate termination or cancellation of the Agreement if the default is not cured before the expiration of thirty days. In other words, the notice period is not the precursor to automatic termination or cessation of rights as contracting party; the passage of the period would constitute the expiration of a contractually provided right to cure default, which would entitle the other party **to effect termination** of the contract. "May be terminated," read plainly, requires further act to effect termination **after** the passage of the notice period, if the party holding the right to effect termination decides to act upon that right. The use of the permissive "may" precludes the interpretation that the defaulting party's rights "shall" be terminated upon the passage of the notice period. The use of the conditional "may" as opposed to the imperative "shall" anticipates (or requires) some future act.

The critical difference between the Court's interpretation of the termination provision and that given by the parties, is our conclusion the Agreement does not automatically terminate upon the expiration of the thirty days if the default is not cured. This is the only reasonable construction of the phrase "may be terminated." If the parties wished for the Agreement to automatically terminate upon the expiration of the thirty day period, the parties could have easily expressed such an intent. Indeed, in the very next paragraph of the termination provision, Paragraph 8.2, the parties did expressly state that upon the passage of a certain condition, namely the filing of bankruptcy, the Agreement would "automatically become terminated."[27] When read in context, the "may be terminated" language of Paragraph 8.1(a) must be contrasted with the "shall automatically become terminated" language of Paragraph 8.2. Therefore, upon the expiration of thirty days from the receipt of the default notice, if the default notice was sent by certified mail, the aggrieved party has the option, or contractual right, to terminate the Agreement; the defaulting party loses the contractually grounded right to cure the default so as to avoid the prospect of termination of the agreement by future act.

In this case, Franke–Misal suggests that the certified mail requirement of Paragraph 8.1(b) is not material. What is material, according to Franke–Misal, is that the debtor receive notice of default. Whether the notice be by certified mail or

24. *See,* Agreement, ¶ 8.1(a) (emphasis added).

25. *Id.* (emphasis added).

26. *Id.* at ¶ 8.1(b).

27. *Id.* at ¶ 8.2 ("This Agreement shall automatically become terminated in the event the LICENSEE voluntarily files for bankruptcy or is involuntarily placed in bankruptcy . . ."). We do not suggest that this provision is effec-

tive, in light of the pre-emptive effect of § 365(b), but point it out to distinguish the language of the two sections; if the parties had wished to mean that the passage of the notice period caused the automatic termination of the agreement, without more, they knew how to say it. They didn't, within Paragraph 1.1.

by facsimile or by Federal Express is immaterial. Therefore, by sending the December 11, 2000 letter by facsimile and by Federal Express, SNF actually received notice that it was in default.[28] Thus, upon the expiration of thirty days from the receipt of the notice by SNF, the contract was terminated.[29]

We guess we agree with Franke–Misal, that the form of notice is immaterial to the question of whether the contract is assumable under § 365(b), which preserves the existence of default that is not curable under state law, but provides a pre-emptive right to cure.

Although not specifically argued to the Court, the Court notes that an argument could be made that, in fact, Franke–Misal complied with this termination action requirement in its January 31, 2001 letter. In that letter, Franke–Misal again detailed the alleged defaults under the Agreement resulting in the issuance of the December 11, 2000 letter, and also detailed defaults perceived to have occurred (or that it became aware of) after the issuance of the December 11, 2000 letter. In addition, however, the January 31, 2001 letter states, "The defaults outlined in the Original Notice have not been cured and, pursuant to the License Agreement and the Original Notice, *the License has been terminated.*"[30] Thus is could be argued that by sending the letter on January 31, 2001 which contains the statement, "the License has been terminated," Franke–Misal complied with the termination provision in the Agreement, as that transmission would have occurred after the expiration of thirty-days from receipt of either the December 11 or December 29, 2000 letter. (We reiterate that this was not argued to the court.)

■ This argument, however, asks the Court to overlook another requirement of the termination provision. Paragraph 8.1(a) states that the Agreement may be terminated if a default has not been cured within thirty days of notice. Specifically, Paragraph 8.1(a) states that the required notice is that which is "provided for hereinbelow." "Hereinbelow" is a direct reference to Paragraph 8.1(b), which specifies that, "the Aggrieved Party shall by certified mail, return receipt requested" notify the other party that it is in default and of the nature of the alleged defaults. Thus,

---

**28.** The submissions of the parties indicate that the facsimile transmission was received in the offices of SNF on December 11, 2000, while the copy of the letter sent via Federal Express was received on December 12, 2000. Thus, if the notice was valid under the Agreement, the thirty day period would expire either on January 10, 2001 or on January 11, 2001.

SNF disputes receipt of either letter on those dates. The submissions also suggest that Franke–Misal, as a result of SNF's dispute regarding receipt of the December 11, 2000 letter, sent a copy of that letter again by facsimile and Federal Express on December 29, 2000 (receipt of which is not disputed). Receipt of the December 29, 2000 correspondence would have the thirty day cure period expire either on January 28, 2001 or on January 29, 2001.

SNF through affidavit testimony submitted to the Court claims that these notices were withdrawn by Franke on behalf of Franke–Misal at a management meeting called to discuss the default issues. Franke–Misal, not surprisingly, disputes SNF's interpretation of the events of the management meeting. While this dispute does create an issue of fact, as will be shown, *infra,* this disputed fact is immaterial to the Court's determination.

**29.** *Id.* at ¶ 8.1 ("This Agreement may be terminated ... if after notice, as provided hereinbelow, the Defaulting Party has failed to cure the breach within thirty (30) days *of receipt of notice of the breach.*") (emphasis added).

**30.** *See,* Exhibit G to Franke–Misal's Statement of Facts Supporting Motion for Summary Judgment, p. 1. (emphasis added).

Paragraph 8.1(b) essentially imposes a requirement that notice sufficient to begin the tolling of the thirty day cure window (and possible termination pursuant to Paragraph 8.1(a)) be given in the precisely indicated form, *i.e.*, certified mail, return receipt requested. The sending of a notice of default via certified mail, return receipt requested, is the trigger which starts the thirty day cure window.

Franke–Misal asks the Court to ignore the specific recitation within the Agreement regarding the form of notice sufficient to trigger the thirty day cure window, arguing instead that notice of default is what is contemplated by the termination provision. To adhere to the express terms of the Agreement would, in the words of Franke–Misal, "elevate form over substance." According to Franke–Misal, because notice is the substance of the termination provision, the receipt by SNF of the December 11, 2000 letter (either on December 11, 12, 29, or 30th),[31] notifying SNF that Franke–Misal perceived that SNF was in default under the Agreement, triggered the thirty day cure window. Therefore, by either January 10, 2001 or, at that latest, January 28, 2001, depending on whether SNF actually received the December 11, 2000 facsimile transmission of the default letter that day, the Agreement either automatically terminated, or was subject to termination (which Franke–Misal accomplished in its January 31, 2001 letter).

In support of its assertion, Franke–Misal cites a Louisiana Fifth Circuit Court of Appeals decision, *First National Bank of Commerce v. DiRosa.*[32] In *DiRosa*, a lender attempted to foreclose on property owned by the DiRosas and upon which the lender held a mortgage. In the mortgage, the acceleration clause called for notice of acceleration to be sent to the DiRosas by certified mail. The lender, however, sent the notice of acceleration by ordinary mail. After commencing foreclosure proceedings pursuant to the executory process provisions of the Louisiana Code of Civil Procedure, the DiRosas sought to have the seizure and sale of the property enjoined. The lender, in response to the DiRosas petition for injunction converted the suit from one via executory to one via ordinaire.[33] Thereafter, the DiRosas excepted to the ordinary process petition, arguing that the lender could not obtain a judgment and thereafter foreclose upon the property in execution of the judgment because it had not given them notice of acceleration as provided for under the mortgage. After a trial, the trial court granted the lender a judgment and directed that the property be seized and sold at judicial sale.

The DiRosas appealed again complaining that the seizure and sale could not be had because of the allegedly defective notice of acceleration. The Louisiana Fifth Circuit Court of Appeal affirmed the trial court, finding that while the notice of acceleration was not of the kind provided for

---

31. *See*, n. 28, *supra*.

32. 545 So.2d 692 (La.App. 5th Cir.1989).

33. Under Louisiana state procedure, the executory process action is one whereby the plaintiff obtains an order of seizure and sale of property subject to a lien upon the presentation of a verified petition, the lien package, etc., if the debt and security instrument contains a consent to judgment, waiver of certain demand rights, etc. Generally speaking, all

facets of the package and actions concerning the package must have been prepared and given correctly to be able to obtain the ex parte order of seizure and sale. The ordinary proceeding is the state law civil action by which a plaintiff obtains a money judgment after service of summons and citation, answer, pretrial activity, trial, etc. In ordinary process suits regarding security interests, the judgment requested is usually one for money judgment and recognition of security interest.

under the contract, the DiRosas, nonetheless, had actual notice of the proceedings in time to take action to protect their rights. The Court stated:

> When the substituted method of transmission of the notice of default and acceleration perform the same function and serves the same purpose as the authorized method, it satisfies the notice requirement.[34]

This language, suggests Franke–Misal, establishes that actual notice is sufficient to begin the tolling of the thirty day cure period and obviates the requirement that notice be given by certified mail, return receipt requested. In fact, we think the case undercuts the argument of Franke–Misal.

Recall our mention of the distinction between executory process and ordinary process within the Louisiana Code of Civil Procedure. (*See* note 33, *supra.*) Executory process, by which a party to a mortgage contract can obtain a court order directing seizure and sale upon certain creditors does not involve citation and summons, the right to answer, the right to trial, the right to respond to the proceedings other than by injunction, or the right to notice before entry of the order of seizure and sale. Executory process does not generate a judgment on the primary debt obligation and is not a process that admits counterclaims, ancillary proceedings, etc. Ordinary process, on the other hand, is the civil action, the lawsuit process, wherein the plaintiff proceeds to obtain a judgment on a petition after service, of the petition citation and summons, delay for answer, etc. The petition can be tested by the right to bring exceptions, affirmative defenses, reconventional demands (counterclaims, in federal parlance), etc.

In *DiRosa*, the court points out that the action was originally an executory process action that sought seizure and sale of the property, but that because of the notice deficiency, the trial court had ordered the proceeding converted to an ordinary proceeding, which required that the plaintiff proceed through a trial to obtain a judgment on the debt and recognizing the mortgage interest. After issuance of the judgment, the property could be sold through execution proceedings enforcing the judgment.[35]

Thus, the failure to give notice in the prescribed form, while not determinative of the right to obtain a judgment after trial, etc., was sufficient to defeat the outright termination of the DiRosas' rights in, to, and upon the mortgaged property through use of the speedy executory process provisions of the Louisiana Code of Civil Procedure. The case stands only for the proposition that under Louisiana law particular forms of notice may not be required to be followed before parties can obtain a formal legal determination as to the extent of default under contracts and the adjudication of obligations due under contracts. However, the case also stands for the proposition that failure to follow the notice requirements does deprive the aggrieved party of the right to utilize the forms of process that allow immediate enforcement of property rights upon property covered by the contract (to which the defaulting party also has rights). In other words, rather than support the Franke–Misal position. *DiRosa* undercuts it through the ultimate proposition for which it stands; to lose rights to property under a contract without the protection of ordinary legal process, notice provisions must be complied with.

---

**34.** *DiRosa,* 545 So.2d at 694.

**35.** *See, Id.* ("Although the use of a different method of transmission of notice of default or acceleration than that contemplated by the mortgage and note may support an exception of prematurity directed against via executory foreclosure . . .").

In the instant case, the Court is confronted with a contract that specifically requires, as the trigger for commencing the thirty day cure window, a notice of default be sent via certified mail. Undoubtedly, the termination provision of the Agreement is concerned with notice to the defaulting party, thus prohibiting a unilateral cancellation of the contract without providing the other party an opportunity to cure its supposedly defective performance. While notice may ultimately be at the heart of the provision, what is apparent from the plain language of the contract is that the parties not only intended for the defaulting party to have notice of its purported default, but also contemplated the question, "What form may that notice take for it to be sufficient to activate the thirty day cure period?" Would a phone call be sufficient? Would a passing remark made at a management meeting begin the cure period? Certainly the parties contemplated written notice, but designated written notice given be via certified mail. All other "notices" become warnings that the "aggrieved" party may, later, seek to formally place the other party in default through the mechanism in the Agreement—notice sent via certified mail—if the "aggrieved" party's concerns are not alleviated.

This Court offers the opinion of the Louisiana Second Circuit Court of Appeal in *Crow v. Southern Natural Gas Co.*[36] In *Crow*, the Second Circuit found that the attempted cancellation of a gas purchase contract was deficient. The contract required ninety-days written notice delivered by registered mail. The party attempting cancellation did not comply with the requirement of delivering the notice by registered mail. Regarding the notice, the Court stated:

Such notices are required by the contract to be in writing and given by registered mail to the parties at addresses designated in the agreement or at such other addresses as the parties may designate in writing. These provisions of the contract with reference to notice were not complied with. *Notice of a party's dissatisfaction with a contract and his desire for a discontinuance given in any manner other than that specified is insufficient.*[37]

Though we do not interpret *DiRosa* as supporting the Franke–Misal argument, we suggest that between the two cases we discuss, *Crow* is the more pertinent. *DiRosa* involved a promissory note and mortgage; *Crow* involved a contract involving the bringing and selling of property and the attempted cancellation of the contract, as opposed to acceleration of indebtedness under a note. Even after acceleration of the indebtedness due under a note, the contract can be satisfied; the debt contract is not terminated by such a decision (the note can be paid, the property released from the effect of the mortgage). *Crow* involves the question of the legal right to cancel or terminate all rights within a contract, leaving the defaulting party with nothing. Because we do not see a conflict between the two cases, we need not make an *Erie* guess, as to which the Louisiana Supreme Court could view as expressive of the correct interpretation of notice provisions. *DiRosa*, within the context of the undisputed facts of this case, would require Franke–Misal to initiate ordinary process legal action to have its rights declared. *DiRosa* is not, we do not think, dispositive of the *Crow* analysis of the type of contract with which we are dealing.

In our case, the language of the Agreement is clear and unambiguous. This

---

**36.** 210 So.2d 596 (La.App. 2nd Cir.1968).

**37.** *Id.* at 601. (emphasis added).

Court will not strip the contract of unequivocal language in an attempt to validate that which the contract does not itself validate. Under the Agreement, notice of default competent to commence the tolling of the thirty day cure period must be sent via certified mail, return receipt requested. Therefore, the December 11, 2000 and December 29, 2000 notices which were sent by facsimile and Federal Express were not sufficient to initiate the thirty day window. Thus, the purported termination of the Agreement in the January 31, 2001 letter was ineffectual.

According to Paragraph 8.1(a) of the Agreement, the defaulting party, in this case SNF, has thirty days from receipt of the properly sent notice within which to cure any defaults. SNF received the notice sent by certified mail on February 5, 2001. Accordingly, SNF had until March 7, 2001, within which to cure the default or be subject to termination. Thus, when SNF was placed in involuntary bankruptcy

on March 5, 2001, the Agreement was still in effect and had not been terminated. Therefore, partial summary judgment is proper declaring that the Agreement had not terminated and the estate obtained rights under the contract sufficient to provide ground for assumption of the contract, unless assumption (and assignment) is otherwise prohibited by the Bankruptcy Code.[38]

## IV. WHETHER APPLICABLE LAW PREVENTS ASSUMPTION AND ASSIGNMENT

Having determined that the Agreement was not terminated prior to bankruptcy does not end the inquiry. It is patently obvious that the trustee of a Chapter 7 bankruptcy estate wishes to have the declaratory judgment regarding the validity of its rights under the Agreement solely for the purpose of assuming the agreement and assigning those rights to a third-party in return for value beneficial to the estate,

---

**38.** Franke–Misal argues that even assuming the Agreement did not terminate prior to bankruptcy, the termination provision of the contract had been initiated, and thus, at the time of bankruptcy, the debtor only had two days, until March 7, 2001, within which to realize the rights granted under the Agreement. This argument, however, overlooks the express provisions of § 108(b) of the Bankruptcy Code which provides:

... if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period of time within which the debtor ... may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of

 (1) the end of such period, including any suspension of such period occurring on or later than the commencement of the case; or

 (2) 60 days after the order for relief.

Because the cure period had not expired prior to bankruptcy, the provisions of § 108 apply to extend the time for action.

In this case, however, Franke–Misal's argument also runs counter to the automatic stay provisions of § 362. The Court has found that the expiration of the thirty day cure window does not automatically terminate the contract. Thus, termination of the contract would require an additional act on the part of Franke–Misal after the cure window had elapsed. At the time of the filing of the petition, either all rights under the Agreement became property of the SNF bankruptcy estate, or the right to assume the contract was afforded the trustee under § 365. *See, Turner v. Avery,* 947 F.2d 772, 774 (5th Cir.1991). To terminate the contract, and effectively place Franke–Misal in control over the rights granted by it to SNF under the Agreement could only be construed as an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Therefore, any action to terminate the Agreement made by Franke–Misal post-petition would be stayed by § 362.

*i.e.*, money to pay the creditors of the estate. Seeing this on the horizon, the Court, at the initial hearing on the motions for summary judgment inquired as to whether "applicable nonbankruptcy law," as provided in § 365(c), prevents the assignment of the Agreement, and would therefore prevent assumption of the agreement by the trustee.

Obviously, if such law did prevent assignment, the Court's ruling on the declaratory judgment becomes moot, because the Chapter 7 trustee is not going to assume a contract of a liquidating debtor without the ability to assign the contract.[39] Therefore, the Court asked for supplemental briefing of the parties on the issue of whether applicable non-bankruptcy law prohibits the assignment of the Agreement, and therefore, its assumption by the trustee.

### A. ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS UNDER THE BANKRUPTCY CODE— § 365(c)(1) AND § 365(f)(1)

In general, § 365 of the Bankruptcy Code allows a trustee to assume or reject any executory contract or unexpired lease to which the debtor is a party.[40] This right extends to contracts in default, subject to certain limitations.[41] Section 365, however, renders certain provisions of executory contracts and unexpired leases null, as such provisions purport to affect the trustee's right to assume or reject the contracts or leases. Congress has therefore granted to the estate rights that the contracting pre-bankruptcy debtor did not have. Congress also recognized as something of a universal law of nature, that contracting parties who are not in bankruptcy would rather not be bound to a contract made with a party who, after execution of the contract, becomes a bankruptcy debtor, and further, that non-bankruptcy law sees this predilection as entirely reasonable and has operated in the non-bankruptcy realm to enforce contractual provisions designed to extricate contracting parties from their contracts if insolvency, bankruptcy, default, etc., should arise. Section 365(c) provides that "ipso facto" clauses, *i.e.*, clauses in the executory contract or unexpired lease which purport to

---

**39.** In this sense, this case can be distinguished from those lines of cases forming an "actual" versus "hypothetical" test for § 365(c). Without dwelling on the point, the "actual" test states that the language of § 365(c) must be read to prevent that specific action (either assumption or assignment) that the applicable law does not allow. *See, e.g., Texaco, Inc. v. Louisiana Land & Exploration Co.*, 136 B.R. 658 (M.D.La.1992). Therefore, and these cases arise (we think) exclusively within the Chapter 11 context, where a debtor in possession wishes to assume executory contracts to maintain them for the estate, if applicable law prohibits only assignment, assumption is allowable. On the other hand, the "hypothetical" test reads the language of § 365(c) strictly, and provides that if applicable law prohibits assignment, the contract may not even be assumed. *See, e.g., Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.)*, 165 F.3d 747 (9th Cir.

1999). This issue is not before the Court because if applicable nonbankruptcy law prohibits assignment, the Trustee is not going to try to assume a contract of a non-going concern. If, however, applicable law does not prohibit assignment, then the conflicting interpretations of § 365(c) have no application.

**40.** *See,* § 365(a) ("... the trustee ... may assume or reject any executor contract or unexpired lease of the debtor."). Although the powers of a trustee are also granted to a debtor-in-possession pursuant to § 1107, the Court uses only the term "trustee" merely for the sake of simplicity.

**41.** *See* 11 U.S.C. § 365(b). Assumption of the contract binds the estate administratively to the performance of the contract, and as well, provides to the estate the benefits of the contract.

terminate the agreement upon the filing of bankruptcy, on the insolvency or financial condition of a party are not enforceable against the estate, so as to allow the non-bankruptcy party to terminate or modify the debtor's (and therefore the estate's) rights under such agreement.

Congress also understood that many contracts that might have no value to a party because of that party's inability to perform could have value to another, but that non-bankruptcy law (again, quite reasonably from a non-bankruptcy perspective) generally enforces limitations upon the right to assign, especially if the party wishing to assign is in default.[42] The right to assume is the primary mechanism by which value is maintained. However, the second step, a statutory method of assuming the right to assign the contract in the face of default, was also necessary. Concurrent with the power of the trustee to assume or reject an executory contract or unexpired lease of the debtor is the power of the trustee to assign the debtor's rights in the contract to a third party under certain conditions,[43] without the necessity of the trustee curing default. Additionally, § 365(f)(1) eliminates transfer restrictive clauses in contracts or leases subject to assumption and assignment by the trustee. Specifically, § 365(f)(1) provides:

> Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . .

Therefore, clauses in contracts, or applicable non-bankruptcy law, which would operate to restrict or prohibit the assignment of rights in and under an executory contract or unexpired lease do not affect the ability of a trustee, inside the bankruptcy process, to assign the debtor's rights under an assumed executory contract or unexpired lease to a third party.

The right of the trustee to assign a contract or lease in the face of a provision restricting transfer or assignment is not absolute, however, as is made clear by the introductory clause of § 365(f)(1), ("Except as provided in subsection (c) of this section . . ."). Subsection (c) of § 365, in turn, states:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment . . . [44]

---

42. The notion that a defaulting party should glean value from a contract to the exclusion of the other party (who conceptually could obtain all rights to the contract upon the default of the defaulting party and thereafter obtain the entire value of the "assignment") is anathema to non-bankruptcy law.

43. *See,* § 365(f)(2).

44. Section 365(c) also provides that a trustee may not assume or assign: a contract to make a loan or extend financing to the debtor; a lease of nonresidential real property terminated prior to bankruptcy, or; a lease of

Courts have grappled with what has been seen by them as an apparent conflict between § 365(f)(1) and § 365(c)(1)(A), because of the superficially contradictory use of the reference to "applicable law."[45] Although both provisions refer to "applicable law," application of § 365(f)(1) renders any such law prohibiting assignment null as it applies to the determination of a trustee to assign a contract, whereas, application of § 365(c)(1)(A) seemingly revives "applicable law" which would prohibit a trustee's decision to assign an executory contract.

■ We are charged with interpreting a statute so as to avoid creating a conflict, within or between provisions of the same statute, and, if the language of the statute will allow, to read the statute in a way that gives cogent effect to all provisions.[46] We here assert (or is it insert) our conclusion; there is no conflict between § 365(c) and § 365(f)(1). Courts that have found one (must have, we think) have been looking for one. We briefly trace and discuss the divergent lines of authority, to set up our general analysis of the relationship be-

an aircraft terminal or airport gate under certain circumstances. *See*, § 365(c)(2), (3), and (4). While subsections (3) and (4) are seen by this Court as examples of piecemeal attempts by Congress to address particular concerns raised to it within the legislative process, we see subsection (2)—contracts to lend money, etc. are not assumable, as the closest thing to pure expression of common sense that can be found within the Bankruptcy Code.

**45.** Courts, however, are in universal agreement that the reference to "applicable law" refers to applicable non-bankruptcy law, whether state or federal. *See, e.g., In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 28 (1st Cir.1984) ("The words 'applicable law' in this section mean 'applicable non-bankruptcy law.' "); *see also, Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494, n. 2 (7th Cir.1993).

**46.** *Chaney v. United States*, 45 Fed.Cl. 309, 316 (1999), "Furthermore, in construing a statute, courts should attempt not to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless or superfluous...." (internal citations omitted); *United States v. Fiorillo*, 186 F.3d 1136, 1153 (9th Cir.1999). "One provision of a statute should not be interpreted in a manner that renders other sections of the same statute 'inconsistent, meaningless or superfluous.' " (internal citations omitted); *Great Northern Nekoosa Corp. v. United States*, 38 Fed.Cl. 645, 656–57 (1997), " '[t]he cardinal principle of statutory construction is to save and not to destroy,' " *id.* . . . . . "In construing

a statute, courts should attempt not to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless, or superfluous...." (internal citations omitted); *Hughes Air Corp. v. Public Utilities Comm'n*, 644 F.2d 1334 (9th Cir. 1981). "Another basic rule of statutory construction is that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless...." (internal citations omitted); *Illinois v. Consolidated Rail Corp.*, 589 F.2d 1327 (7th Cir.1978), "... It is a well-established principle of statutory construction that, whenever possible, statutes are to be construed so that no clause, sentence or word is rendered void or contradictory .... Given the possibility of conflict between the provisions of [a statute], it is our duty to attempt to reconcile the two provisions, absent clearly expressed Congressional intent to the contrary ...." (internal citations omitted); *Nevada Power Co. v. Watt*, 711 F.2d 913 (10th Cir.1983), "... statutes must, where possible, be interpreted so as not to render any clause or provision unnecessary, contradictory, or insignificant...." (internal citations omitted); *Atwell v. Merit Systems Protection Bd.*, 670 F.2d 272 (D.C.Cir. 1981), "In reaching this result, we are guided as well by the cardinal canon of statutory construction that dictates that provisions should, whenever possible, be construed to achieve consistency...." (internal citations omitted); *United States v. Stauffer Chem. Co.*, 684 F.2d 1174 (6th Cir.1982), "Different portions of the same statute should be read and interpreted consistently with each other, avoiding conflicts...." (internal citations omitted).

tween the two subsections and our resultant interpretation of § 365(c). We have to do this because of the nature of the contract at issue. The contract with which we a dealing is one involving patent rights. There is much travail within the jurisprudence concerning the assumability and assignability of patent rights. Before we can get to the question of the nature of the contract at issue, we have to fix our context—what does § 365(c)(1) mean? How do §§ 365(c) and 365(f)(1) fit together?

Those courts that first encountered the ostensibly conflicting references to "applicable law" in §§ 365(f)(1) and (c)(1)(A) interpreted the language of § 365(c)(1)(A) to apply only to personal services contracts.[47] Thus, such courts reasoned, if the executory contract did not involve a contract for personal services, the provisions of § 365(f)(1) would render any restriction or prohibition on transfer of such contract of no moment. In essence, all contracts were assumable or assignable unless the contract was a "classic" personal services contract.

The Fifth Circuit, however, adopted a more expansive interpretation of § 365(c)(1)(A) in *In re Braniff Airways, Inc.*[48] In *Braniff,* The Fifth Circuit determined that certain regulations governing the leasing of space at Washington National Airport ("National") excused the United States, as lessor or certain premises at National, from accepting performance from an airline to which Braniff Airways, Inc. ("Braniff") had attempted to assign its lease rights at that airport. Originally, Braniff was the lessee of airport terminal space at National. After filing bankrupt-

cy, Braniff attempted to assume the lease and assign it to Pacific Southwest Airlines, Inc. ("PSA"). Noting that many bankruptcy courts confronting the language of § 365(c)(1)(A) had determined that the statute applied only to personal services contracts, the Fifth Circuit stated:

> Nothing in the statute authorized the district court to depart from the express language of § 365(c), which provides for its application to unexpired leases and belies any limitation to personal service contracts. It may well be that the *impetus* for Congress' enactment of § 365(c) was to preserve the pre-Code rule that "applicable law" precluding assignment of personal service contracts is operative in bankruptcy. However, *the drafters actually codified a much broader principle.* Surely if Congress had intended to limit § 365(c) to personal service contracts, its members could have conceived of a more precise term than "applicable law" to convey that meaning.[49]

The "applicable law" pertinent to the *Braniff* court's inquiry stated that the FAA had full authority and control over National, and that no person may operate at National without the FAA's approval. Thus, the "applicable law" excused the FAA, or the United States, from accepting the performance of a carrier other than Braniff without FAA approval. PSA had not been approved for operation at National, and therefore, § 365(c) prohibited the attempted assignment of Braniff's lease to PSA.

---

**47.** *See,* discussion contained in *In re Lil' Things, Inc.,* 220 B.R. 583, 587–588 (Bankr. N.D.Tex.1998), and cases cited therein.

**48.** *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935 (5th Cir.1983).

**49.** *Braniff,* 700 F.2d at 943, (bold and underlined emphasis added) (italicized emphasis in original) (citation omitted).

■ Of particular importance in understanding the combined workings of §§ 365(f)(1) and (c)(1)(A) is the Fifth Circuit's recognition that while a personal services contract is one species of contract which falls within the ambit of § 365(c)(1)(A), that provision provides treatment for a broader range of contracts and leases other than just those for personal services.[50] As shown in *Braniff*, a provision in the law generally applicable to all contracts with the United States regarding National airport which prohibited assignment without approval of the United States (or its regulatory agency charged with administration of the airport) was sufficient to defeat assignment under § 365(c)(1)(A). In other words, the debtor's right to transfer its rights under a lease of space at an airport was restricted by a provision of generally applicable law, which operated without reference to the particulars of the lease contract or the status of the lease itself. Such a restriction on transfer was of the kind contemplated by § 365(c)(1)(A), and therefore, excepted from the operation of § 365(f)(1).

Following *Braniff*, a number of courts recognized that the reference within § 365(c)(1)(A) to "applicable law" is more expansive than merely a veiled reference to "applicable law" regarding only personal service contracts.[51] However, the Circuit

Courts are divided in their approach to defining the exact scope of "applicable law" as it is referred to in §§ 365(f)(1) and (c)(1)(A).[52]

In *In re Pioneer Ford Sales, Inc.*,[53] the First Circuit Court of Appeal, in an opinion authored by then Judge Breyer, confronted the issue as to whether § 365(c)(1)(A) prohibited the debtor from assigning its Ford Motor Company ("Ford") dealership franchise to a third party dealer. Rhode Island state law, relevant to the case, provided that:

> no dealer … shall have the right to … assign the franchise … without the consent of the manufacturer, except that such consent shall not be unreasonably withheld.[54]

Ford asserted that the proposed assignment of Pioneer Ford Sales, Inc.'s dealership was prohibited by this provision of applicable state law, and therefore, § 365(c)(1)(A) prohibited the assignment of such dealership by the trustee. The estate and the proposed assignee asserted that the statute was limited in application to personal service contracts, and therefore that the applicable law, as it did not relate to personal services contracts was written out by § 365(f)(1).

The First Circuit agreed with Ford. Regarding the suggestion that the statute

---

**50.** Though not mentioned by the Fifth Circuit, limiting the applicability of § 365(c)(1)(A) to merely personal services contracts would seem to render the use of the words "lease" in the statute superfluous. Does a "personal services lease" exist? Would such a thing be the same as a personal services contract? If so, why would Congress choose to use the phrases "any executory contract or unexpired lease," and "such contract or lease," in the statute if the statute only applies to one form of contract?

**51.** *See, In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 29 (1st Cir.1984); *In re West Electronics,*

*Inc.*, 852 F.2d 79, 83 (3rd Cir.1988); *Metropolitan Airports Comm'n, v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492 (7th Cir.1993).

**52.** *See, Rieser v. Dayton Country Club Co. (In re Magness)*, 972 F.2d 689, 695 (6th Cir.1992); *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534, 538 (11th Cir.1994).

**53.** 729 F.2d 27 (1st Cir.1984)

**54.** *Id.* at 28, citing R.I. Gen Laws § 31–5.1–4(C)(7).

was limited to personal services contracts, the Court stated:

> The language of the section does not limit its effect to personal service contracts. It refers *generally* to contracts that are not assignable under nonbankruptcy law. State laws typically make contracts for personal services nonassignable (where the contract itself is silent); but they make other sorts of contracts nonassignable as well. The legislative history of § 365(c) says nothing about "personal services." To the contrary, it speaks of letters of credit, personal loans, and leases—instances in which assigning a contract may place the other party at a significant advantage. The history thereby suggests that (c)(1)(A) has a broader reach.[55]

Regarding the purported conflict between the references to "applicable law" in §§ 365(f)(1) and (c)(1)(A), the Court continued:

> As a matter of logic, however, we seen no conflict, for (c)(1)(A) refers to state laws that prohibit assignment "whether or not" the contract is silent, while (f)(1) contains no such limitation. Apparently (f)(1) includes state laws that prohibit assignment only when the contract is *not* silent about assignment; that is to say, state laws that enforce contract provisions prohibiting assignment. These state laws are to be ignored. The section specifically excepts (c)(1)(A)'s state laws that forbid assignment even when the contract *is* silent; they are to be heeded.[56]

In the eyes of the *Pioneer Ford* court, the reference to "applicable law" in § 365(c)(1)(A) means laws which prohibit assignment of a contract regardless of whether the contract contains a prohibition on assignment. "Applicable law," as referenced in § 365(f)(1), means only those laws that would uphold or enforce a provision in a contract restricting or prohibiting assignment. Thus, according to the *Pioneer Ford* court, if a law, generally applicable to all contracts of a specific type, operates to prohibit assignment of such contracts even if the contract is silent as to whether assignment is prohibited or restricted, that law is enforceable against the trustee in bankruptcy to prohibit the trustee from assuming and assigning the contract to a non-debtor third party. If, however, the law at issue is one which merely enforces a contractual prohibition or restriction on assignment if one is contained in the contract at issue, this type of law does not fall within the exception to § 365(f)(1) created in § 365(c)(1)(A), but rather is dealt with solely via the provisions of § 365(f)(1), and thus, is rendered unenforceable.[57]

Following the *Pioneer Ford* case, at least one circuit adopted the *Pioneer Ford* delineation of the scope of §§ 365(c)(1)(A) and (f)(1).[58]

Confronting the "applicable law" issue in the context of a membership to a private golf club, the Sixth Circuit, however, took a somewhat different approach to the respective scope of "applicable law" as the phrase is used in §§ 365(c)(1)(A) and

---

**55.** *Id.* at 29, (emphasis in original) (citations omitted).

**56.** *Id.* (emphasis in original) (citations omitted).

**57.** Before moving to a determination of whether an applicable law exists which would excuse Franke–Misal from performance (or

from accepting performance), the Court pauses here to clarify and refine what it perceives to be a needless split of authority occurring among the circuit and lower courts.

**58.** *See, In re West Electronics, Inc.,* 852 F.2d 79, 82–83 (3rd Cir.1988).

(f)(1).[59]

In *Magness*, a member of an exclusive golf club filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code. As part of the bankruptcy case, the trustee sought to assume the debtor's membership at the golf club and thereafter transfer the membership to another party. The golf club, however, was a private organization which strictly limited the number of members who had full access to the golf course, and which had developed rules and procedures for filling vacancies in the number of memberships entitled to full golf privileges.

Treating the membership privileges of the debtor as an executory contract, the Sixth Circuit then inquired whether the trustee had the power to assume and assign the debtor's membership to another person outside the rules established by the golf club. The Court began by examining the First Circuit's decision in *Pioneer Ford*. As noted previously, the First Circuit held that the reference in § 365(f)(1) to "applicable law" referred only to those laws which would uphold provisions in contracts prohibiting or restricting assignment (after excepting from § 365(f)(1) "applicable law" covered by § 365(c)(1)).[60] The Sixth Circuit took special issue with this limitation of "applicable law" in § 365(f)(1), and concluded that, "There is simply nothing in the language of § 365(f) which supports the limitation read into it by that court."[61]

Instead, the Sixth Circuit determined that § 365(f)(1) stood for the proposition that a general prohibition against the assignment of executory contracts, whether by the contract itself or by "applicable law," was ineffective to prohibit or restrict the trustee from assigning a contract. Section 365(c)(1), however, is a specific and limited circumstance in which the power of the trustee to assign a contract in the face of applicable law or contractual provisions to the contrary is curtailed. According to the *Magness* Court:

> Subsection (c) states that if the attempted assignment by the trustee will impact upon the rights of a non-debtor third party, then any applicable law protecting the right of such party to refuse to accept from or render performance to an assignee will prohibit assignment by the trustee. While subsection (f) and (c) appear contradictory by referring to "applicable law" and commanding opposite results, a careful reading reveals that each subsection recognizes an "applicable law" of markedly different scope.

> ... Section 365(c) requires us to look at the rights and duties of the club as the other party to the contract and the "applicable law" regarding whether the club must accept performance from the assignee member chosen by the trustee or render performance to that member. As required in § 365(c), the applicable law of controlling significance to the solution of this problem addresses the interests of the non-debtor third parties, rather than law relating to general prohibitions or restrictions on assignment of executory contracts covered by § 365(f).[62]

Following this thought line, the Court then investigated whether "applicable law" would excuse the golf club from accepting as a full golfing member a person chosen by the trustee. The *Magness* court first

---

59. *See, Rieser v. Dayton Country Club Co.* (*In re Magness*), 972 F.2d 689 (6th Cir.1992).

60. *See, Pioneer Ford*, 729 F.2d at 29.

61. *Magness*, 972 F.2d at 695.

62. *Id.* at 695–696.

noted that if the trustee was allowed to assign the golf membership, the golf club would be in breach of its agreement with persons on the waiting list. Then, after lauding the wisdom and experience of the district court, the Sixth Circuit determined that the district court's conclusion that Ohio law "does not want the courts involved in the internal workings of associations when those associations have rationally developed rules and procedures" was a sound restatement of the law.[63] Because the law did not want the courts involved in the inner workings of private clubs, the Sixth Circuit affirmed the district court's conclusion that the trustee could not assign the membership because of the limitation on the trustee's assignment power under § 365(c)(1)(A).

The Sixth Circuit also advanced an additional rationale for finding that the golf membership could not be assigned. The Court further concluded that the nature of the membership was a personal contract. As the membership was a personal contract, and Ohio law prohibited the assignment of personal contracts, "applicable law" excused the golf club from accepting performance from the trustee's assignee. As we will see, though the court did not recognize it, this "additional" rationale was the correct rationale, but is in no way dependent upon or generated by the court's interpretation of the interplay between § 365(c) and § 365(f)(1).

Following *Magness*, several circuits adopted and further refined its definition of the scope of "applicable law" as it is referred to in §§ 365(c)(1)(A) and (f)(1).[64] For instance, in *In re Catapult Entertainment, Inc.*, the Ninth Circuit stated, "The Sixth Circuit has credibly reconciled the warring provisions by noting that 'each subsection' recognizes an 'applicable law' of markedly 'different scope.'"[65] Continuing, the Ninth Circuit stated:

> Subsection (c)(1), however, states a carefully crafted exception to the broad rule—where applicable law does not merely recite a general ban on assignment, but instead more specifically "excuses a party ... from accepting performance from or rendering performance to an entity" different from the one with which the party originally contracted, the applicable prevails over subsection (f)(1). In other words, in determining whether an "applicable law" stands or falls under § 365(f)(1), a court must ask *why* the "applicable law" prohibits assignment. Only if the law prohibits assignment on the rationale that the identity of the contracting party is material to the agreement will subsection (c)(1) rescue it.[66]

While *Magness* and *Catapult* formulations regarding the scope of "applicable law" in § 365(c)(1)(A) might be superficially persuasive, they are, nonetheless, wrong. In each formulation, the focus of

---

**63.** We have no idea what this means. There is no "private club" provision in § 365.

**64.** *See, Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 495 (7th Cir.1993) (the purpose of § 365(c)(1) "is rather narrow: to prevent a trustee from forcing a party to accept performance from, or provide performance to, someone other than the party with whom it contracted in those situations where the identity of the party is central to the obligation itself."); *City of Jamestown v.*

*James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534, 537–538 (11th Cir.1994); *Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.)*, 165 F.3d 747, 751–752 (9th Cir.1999); *see also, Gould v. Antonelli (In re Antonelli)*, 4 F.3d 984 (4th Cir.1993) (unpublished).

**65.** *Catapult*, 165 F.3d at 752.

**66.** *Id.* (citations omitted) (emphasis in original). So we see where we are heading here?

§ 365(c)(1)(A) is limited strictly to what the courts term "personal contracts" (which we think are "personal services" contracts in disguise). In other words, by requiring "applicable law" as it is described by § 365(c)(1)(A) to restrict transfers of rights only if the identity of the party is material, the statute is limited in application to only those laws which restrict transfer of personal contracts, which, though they say they are not so saying, the courts limit to personal services contracts.[67]

The problem with the *Magness* and *Catapult* interpretations is not necessarily that these interpretations limit applicability of § 365(c)(1)(A) to personal services contracts. If that was all the opinions said, we could say that because we are a court in the Fifth Circuit, *Braniff* compels a different result. The real problem stems from the fact that the *Magness* and *Catapult* courts purport to offer an interpretation that is not limited to personal service contracts, when it really is, *Magness* and *Catapult* require that a generally applicable restriction or prohibition on transfer or assignment of contractual rights contained within "applicable law" must be examined to determine whether personality is at the heart of the law; it is only contracts concerned with the personality or identity of the contracting parties that are covered by § 365(c)(1)(A). Any other law is merely a general proscription against assignment and is dealt with (and nullified) under § 365(f)(1).

What the *Magness* and *Catapult* courts miss, however, is that *every law of general application to a certain set of contracts, that is, a law not dependent upon the terms of the contract itself, which prohibits or restricts transfers is by definition making the identity of the parties to the contract material.* In effect, a law of general application which states that certain forms of contracts are not transferable, makes that contract a personal contract. A law which states that certain forms of contracts cannot be assigned is inherently concerned with the identity of the parties to the contract. By limiting or prohibiting assignment, the law is stating that regarding these kinds of contracts, only the parties who enter the contract may perform, or accept performance (whichever the case may be). An anti-assignment law which is not concerned with or dependent upon language in the contract, either establishes substantively that the contract at issue is by its nature a personal contract, and generally speaking provides the substantive change in the character of an obligation from one which without the law would not be considered a personal obligation, to one which is strictly personal to the parties to the contract. This is done (again, generally speaking) through law which posits certain contracts as personal (or non-assignable) and through law that enforces the parties' rights to legislate (through the contract) their own determination of that the contract is personal.[68]

---

67. "Personal service contracts" and "personal contracts" have little, if any, distinction, except that as we will see, the personal services contract is a subset of the personal contract. A contract for a "personal service," such as the booking of a band to play at the House of Blues, or for an attorney to represent oneself, is, at most, a subspecies of "personal contracts," or those contracts in which the personality of the contracting parties is the primary, substantial (if not only) cause for the creation of performance of the contract itself, but does not have to relate solely to personal services.

68. Under Louisiana contract law, this principle is evidenced by the dichotomous division of obligations (contracts, in the civil law, being conventional, rather than legal or natural, obligations) into those which are heritable

The point of the foregoing discussion is to highlight that the statutory distinction so clearly perceived in *Magness* is not, regardless of the words of the Ninth Circuit, credible. Any law which states a generally applicable prohibition on assignment transmutes the nature of such contract from impersonal or heritable to a personal contract. The fact that all generally applicable laws speaking to the subject of non-assignability are laws concerned with the identity of the parties denotes a fundamental flaw in the *Magness* court's attempt to discredit the reasoning of *Pioneer Ford*. By attempting to make a distinction between "applicable law" in § 365(c)(1)(A) as referring to those laws which prohibit assignment on the basis that the law is concerned with identity of the parties, or personal materiality, and "applicable law" in § 365(f)(1) as referring to those laws for which the underlying rationale of the law is not concerned with personality, *Magness* misses the point that any generally applicable law that prohibits assignment is inherently concerned with the identities of the contracting parties. In fact, generally applicable law that allows parties to the contract to convert the obligations and rights into obligations that are not delegatable and rights that are not assignable, by means of contractual language, are laws that allow the parties to designate their contract as inherently concerned with the identity of the contracting party.

The Sixth Circuit seized upon the difference in language used in the two subsections. Section 365(f)(1) uses the phrase "notwithstanding ... applicable law that prohibits, restricts, or conditions the assignment of such contract ...." Section § 365(c)(1)(A) uses "excuses a party ... from accepting ... or rendering performance." By focusing on the phraseology in § 365(c)(1)(A), embodied in the reference to applicable law that **excuses a party from performing or accepting performance**, as the basis for its conclusion that personality is the key measure of whether the law is applicable in the sense that it fits within § 365(c)(1)(A), the Sixth Circuit attempted to implant an artificial limitation on the scope of the statute, (one that has been rejected by *Braniff*). In reality, the interpretation does not restrict the scope in the manner which the Sixth Circuit intended.

Recall that § 365(c)(1) states, in part:

The trustee may not assume or assign any executory contract ... *if applicable law excuses a party, other than the*

---

and those which are strictly personal. *See,* La. Civ.Code arts. 1765, 1766. Heritable obligations are those when performance may be enforced by a successor of the obligee or obligor, and are freely transferable among parties, La. Civ.Code art. 1765. Strictly personal obligations, by contrast, are those that arise when only the obligee may perform, or where the obligor is solely the one to whom performance may be given. La. Civ.Code art. 1766. An obligation must be characterized as either one or the other. As Article 1765 makes clear, an ordinarily heritable obligation may be transformed into a strictly personal obligation by either the terms of the contract, *i.e.,* a provision in a contract limiting or prohibiting assignment, or by the nature of the contract, or if the law states that a certain form of obligation is not transferable or assignable. Such obligations lose their heritable character and are, instead, strictly personal. We discuss Louisiana law in more detail below, but have just pointed out at least one state law that would not be enforceable under § 365(c)(1)(A), but rather would be written out by § 365(f)(1); Article 1765 provides that contracts can transform heritable obligations to personal obligations, and that such contractual provisions are enforceable. Though this is an applicable law that can be said to generally restrict transfer and assignment, it is dependent upon the contract and therefore is not enforceable under § 365(c)(1)(A). Because it is not carved out of § 365(f)(1) through § 365(c)(1)(A), it is written out by § 365(f)(1).

*debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession* ... and such party does not consent to such assumption or assignment ... [69]

The operative phrase in this statute is "if applicable law excuses a party ... from accepting ... or rendering performance to an entity other than the debtor." Certainly, personal contracts or contracts in which the identity of the party is substantially fundamental to the formation of the contract fit within the statutory language of § 365(c)(1). Why? Because the law states that personal contracts may not be assigned.[70] But in stating that a personal contract may not be assigned, the law is essentially stating that the other party to the contract—the one not attempting to assign—may not be bound by that assignment. What does this mean? It means, at its core, that the other party to the contract will not be bound to accept from or render performance to the putative assignee of the contract. There is no other

meaning to a prohibition or restriction on assignment save allowing the party opposite that attempting to assign to excuse himself from accepting or rendering performance. Indeed, even if the contract were not "personal" in the sense of a traditional "personal services contract," a law prohibiting assignment, as discussed, renders an ordinary commercial contract personal because it allows the non-assigning party not to be bound to accept or render performance to a party other than that with whom he originally contracted. It would be ridiculous to have a law which prohibited assignment, but which, if it was assigned, would nonetheless, bind the non-assigning party to accept or render performance to the putative assignee, regardless of the intention of the non-assigning party.

We think the ultimate conclusion of the *Magness* court is correct. Applicable state law prohibited assignment of the ownership without consent of the club, whether or not the agreement contained a restriction or transfer. However, the approach of the court (which eschews the simple, in favor of the over-arching) has generated

---

**69.** (emphasis added).

**70.** Indeed, in *Magness,* the basis for finding that the golf club membership could not be assigned by the trustee was that the contract was a personal contract, and that applicable law prohibited assignments of personal contracts. *See, Magness,* 972 F.2d at 696 ("They are personal contracts and Ohio law does not permit the assignment of personal contracts."). Before leaving the *Magness* opinion, the Court notes that another attempted basis for finding that § 365(c)(1)(A) prohibited the trustee's assignment was that Ohio law respected the inner workings of private organizations. However, if the trustee was assuming the debtor's membership in the golf club—a membership subject to the rules of the club—and that membership was treated as an executory contract by the courts, all that is said, in the statement about Ohio law respecting the rules of private organizations, it is that Ohio law upholds restrictions al-

ready written into such executory contracts. In this sense, the *Magness* Court found that a law which enforces transfer restrictions in contracts falls within the ambit of § 365(c)(1)(A). It seems ironic, to say the least, that while the *Magness* Court wished to limit the application of § 365(c)(1)(A), it actually went beyond the limitation of § 365(c)(1)(A) imposed by the *Pioneer Ford* Court and expanded it to the point where the reference to "applicable law" in § 365(f)(1) has become absolutely meaningless. In other words, *Magness* interprets § 365(c)(1) to enforce state law upholding restrictions on transfers that are contained in agreements, but only if those state laws uphold contractual provisions restricting transfer of certain types of rights. This directly contravenes the actual language of the actual statute, which expressly requires that the law that enforces transfer restrictions "whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties."

mischief. By finding a distinction of nature between prohibitions on assignment and the right to refuse performance by an assignee, the court constructed a camouflaged return to the old personal services limitation, while simultaneously denouncing it.

The mischief is exemplified in two recent decisions, *In re James Cable Partners, L.P.*, and *In re Lil' Things, Inc.*[71] In the *James Cable* case, the city of Jamestown, Tennessee granted a franchise for cable television rights in the municipal limits to a Clarence Harding. Through a series of assignments, which the city approved, the franchise was eventually assigned to James Cable Partners, L.P. ("JCP"). Subsequently, JCP filed bankruptcy under Chapter 11. As part of its reorganization, JCP sought to assume its cable franchise agreement with the city of Jamestown. The city objected, claiming that its ordinances prohibit the assignment of the cable franchise without the approval of the city. Specifically, the ordinance stated:

The rights and privileges herein granted shall not be assignable nor transferable in any bankruptcy proceedings, trusteeship, receivership or by operation of any law, and in the event of such assignment or transfer, this grant shall terminate forthwith, *nor shall said company sell, lease, assign, or otherwise alienate this grant or any privilege hereunder without the prior approval of the Board of Mayor and Alderman.*[72]

According to the city, this prohibition on assignment in its ordinances was governed by § 365(c)(1)(A), and therefore, the contract could not be assumed. Instead of approaching the problem before it by analyzing the hypothetical/actual test discussed *supra*, the Eleventh Circuit undertook to examine whether the language of the ordinance fell within the purview of § 365(c)(1)(A) in the first place.

The Eleventh Circuit concluded that the language in the ordinance did not fit within the meaning of § 365(c)(1)(A). First, the Court reasoned, "applicable law" must mean "applicable law" other than general prohibitions barring assignment, because § 365(f)(1) states that general rule that "applicable law" barring assignment does not prohibit a trustee in bankruptcy from assigning the contract. Thus, the Court asked, does the "applicable law" excuse the City from performance or accepting performance under the cable contract from a third party? The Court then reasoned:

A general prohibition against assignment does not excuse the City from accepting performance from a third party within the meaning of § 365(c)(1). In order to be excused from accepting performance, the City would need to point to applicable law such as a Tennessee law that renders performance under the cable franchise agreement nondelegable. . . . The City proffers no Tennessee law, other than the general prohibition, against assignment found in section 12 of the Ordinance and laws validating such prohibition, that would excuse the City from accepting performance from a third party. Accordingly, we conclude that applicable Tennessee law does not excuse the City from accepting performance from an entity other than James Cable . . . [73]

---

**71.** *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534 (11th Cir.1994); *In re Lil' Things, Inc.*, 220 B.R. 583 (Bankr.N.D.Tex.1998).

**72.** *James Cable,* 27 F.3d at 536, citing Jamestown City Ordinance No. 1 3–1–77, § 12 (emphasis added).

**73.** *James Cable,* 27 F.3d at 538.

What? What other law could the City offer to suggest that it was excused from performance other than its ordinance prohibiting assignment? We assume the other "laws validating such prohibition," were not laws relating to contractual terms, but rather state laws conferring upon municipalities the authority to prohibit assignment without consent through the ordinances under which franchise were to be issued. The ordinance stated that its cable franchisee cannot assign its rights under the contract without consent. What purpose would this statute serve other than to excuse performance, or to allow the city to refuse the performance of a third party if the cable franchise was transferred without its consent? The ordinance did not refer to contractual terms. The ordinance, presumably promulgated under the authority of state law, was the law concerning the franchise.

The quote from the *James Cable* opinion serves to outline the fallacious reasoning used by courts interpreting the competing references to "applicable law" in §§ 365(c)(1)(A) and (f)(1). First, the Eleventh Circuit states, "A general prohibition against assignment does not excuse the City from accepting performance from a third party within the meaning of § 365(c)(1)." This rule is apparently divined by the Court from its interpretation of § 365(f)(1) as an outlay of the general rule that prohibitions on assignments are ineffective against a bankruptcy trustee to prevent his/her assignment of the executory contract. While this is true, the Eleventh Circuit fails to comprehend that § 365(f)(1) is not limited to general prohibitions on assignments, it does not refer to "general prohibitions." Also because the section refers only to those laws not covered by § 365(c), § 365(f)(1) cannot logically operate by defining the laws that are subject to § 365(c), extending § 365(f)(1) to all laws, kicking them out and then

trying to figure out what could be left to place within § 365(c). As pointed out by the First Circuit in *Pioneer Ford*, other types of "applicable law" exist which are not general prohibitions on assignment, but rather enforce contractual provisions prohibiting or restricting assignment, and to other laws which do not fit the description of a general prohibition on assignment, but rather are contract-dependent. The statutory construct logically precludes the approach of the Eleventh Circuit, which has the effect of reading out, through § 365(f)(1), the exact types of laws that are implicated by § 365(c), in a purported attempt to delineate the scope of laws implicated by § 365(c). The ultimate objective, conscious or not, is reversion to the personal services limitation that has been ruled out (in reality) by many circuits and is said to have been ruled out even by the Sixth and Eleventh Circuits (though it cannot have been).

Through using § 365(f)(1) to eradicate general prohibitions on assignment, the Eleventh Circuit reasoned that § 365(c)(1) must refer to "applicable law" other than general prohibitions on assignment. This rationale arises from either one of two assumptions: 1) a failure to perceive that § 365(f)(1) explicitly makes reference to § 365(c)(1) as an exception to the rule provided by § 365(f)(1), and thus, carves out a certain subset of those "applicable laws" ordinarily covered by § 365(f)(1), or; 2) if it did recognize the exception, then § 365(c)(1) must be a smaller subset than that described by § 365(f)(1) or the exception would swallow the rule.

Either way, by first defining the scope of § 365(f)(1) as nullifying general prohibitions on assignment, the Eleventh Circuit found itself having to correlatively limit the reference to "applicable law" in § 365(c)(1)(A). In doing so, the Court limited § 365(c)(1)(A) by stating, "In order to

be excused from accepting performance, the City would need to point to applicable law ...that renders performance under the [contract] *nondelegable*."[74] Nondelegable? Where does this requirement come from? The only reference in the statute to delegation is within the clause, which appears twice, "whether or not such contract or lease prohibits or restricts assignment of rights or **delegation of duties**."[75] This clause is undeniably not the operative clause within the statute. The operative clause of § 365(c)(1)(A), in terms of what applicable law is covered by the subsection, is that law which "excuses a party ... from or rendering performance to an entity other than the debtor ..." The function of the clause containing the reference to delegation acts only to limit the operative clause set forth above (but not in the way in which the Eleventh Circuit interpreted it) to applicable laws which operate to excuse performance whether or not the contract contains a clause purporting to restrict assignment or delegation. "Applicable law," however, is not modified by a requirement that it singularly prohibit delegation, but rather that it excuse performance or excuse acceptance of performance without reference to restrictive provisions in the contract.

As stated previously, the sole purpose of a law prohibiting assignment is to excuse the parties to the contract from accepting or rendering performance to a third party. So too does a prohibition on delegation. If one cannot delegate one's duties, the other party is excused from accepting performance. Perhaps the best way to rationalize the provisions of § 365(c)(1)(A) is to break assignment and delegation into separate concepts, although these terms are generally used interchangeably. When one speaks of assignment, one is generally speaking of an assignment of rights, that is the right to have the other party perform (although an assignment can mean, and usually does mean, an assignment of the rights, and a corresponding delegation of the duties to which the contract binds that party). When one speaks of delegation, one is speaking of a delegation of duties, *i.e.*, a party wants a third party to perform its obligations under the contract. Thus, a law prohibiting assignment of rights, is, in effect, stating that the parties may not sell their right to have the other party perform the contract. Essentially, such a law excuses the other party (the non-assigning party) from rendering performance otherwise due the assigning party. A law which prohibits delegation means that the parties may not have a third party perform their obligations under the contract. Therefore, the non-delegating party may refuse to accept performance from anyone other than the party with whom he originally contracted.

Viewed in this light, the Eleventh Circuit's conclusion that the Jamestown city ordinance prohibiting assignment of the cable franchise agreement is not "applicable law," because it is merely a general prohibition on assignments which is done away with, in the bankruptcy context, by § 365(f)(1), cannot pass muster against the clear command of § 365(c)(1)(A) that laws excusing either the rendering *or* acceptance of performance must be enforced against the trustee.

Another example of the mischievous consequences that result from following the *Magness* approach to interpreting the statutory language of § 365(c)(1)(A) can be found in *In re Lil' Things, Inc.*[76] In *Lil' Things*, the debtor operated a chain of

---

74. (emphasis added).

75. § 365(c)(1), (emphasis added).

76. 220 B.R. 583 (Bankr.N.D.Tex.1998).

retail stores. After filing bankruptcy, the debtor eventually recognized that it could not successfully reorganize, and therefore, sought to liquidate its assets, among which were leasehold interests in shopping centers and retail outlets. The debtor moved the court for permission to assume and assign various leases, one of which was on property located in Texas. The landlord objected, arguing that Texas law forbid the assignment of leasehold interests without the consent of the landlord, and therefore, was barred by § 365(c)(1)(A). Specifically, Texas law provided:

> During the term of a lease, the tenant may not rent the leasehold to any other person without prior consent of the landlord.[77]

After reviewing the circuit court decisions on the subject, the bankruptcy court concluded that § 365(f)(1) states the general rule that prohibitions on assignments are invalid, but § 365(c)(1)(A) provides an exception to that rule where applicable law protects the right of the non-debtor third party from rendering or accepting performance. Because the Texas statute prohibiting assignments of leaseholds was merely a general prohibition on assignments, that statute did not fall within the scope of "applicable law" referenced in § 365(c)(1)(A).

Continuing, the bankruptcy court attempted to rationalize its decision with an appeal to the policy of the Bankruptcy Code. According to the bankruptcy court, § 365 gives debtors the ability to assign their "valuable leases," while at the same time offering some protection to the rights of third parties via § 365(c)(1)(A). After beseeching the general public's interest in maximizing the value of bankruptcy estates, the court explained how, exactly, § 365(c)(1)(A) acts to protect the rights of third parties. The bankruptcy court stated:

> ... § 365(c)(1)(A) acts to balance the rights of third parties who contracted with the debtor and whose rights may be prejudiced by having the contract or lease performed by an entity with which they did not enter into the agreement. This right becomes paramount under § 365(c)(1)(A), *where the identity of the party rendering performance under the contract is material to the contract, and the contract is non-delegable under applicable non-bankruptcy law*.[78]

Once again the concepts of "materiality of identity" and "delegability" have crept into the workings of § 365(c)(1)(A). As discussed previously, nowhere does § 365(c)(1)(A) expressly require a materiality of identity, or personality, as the fundamental driving force of whether that statute applies. Indeed, such a requirement arguably conflicts with the Fifth Circuit's decision in *Braniff*, wherein it stated that § 365(c) "provides for its application to leases and belies any limitation to personal service contracts."[79] Neither, too, does § 365(c)(1)(A) hinge upon "delegability" as the cause for operation of the statute.

What can be gleaned from the bankruptcy court's decision in *Lil' Things* is the

77. *Lil' Things*, 220 B.R. at 585, n. 2., quoting Tex. Prop.Code § 91.005. Although the provision of Texas law cited above technically speaks only to the ability of the tenant to sublet the premises upon which it holds a leasehold interest, Texas courts have interpreted the provision to be a general prohibition on assignment as well. *Id.* citing *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 111, n. 2 (Tex.Ct.App.1996).

78. *Lil' Things*, 220 B.R. at 584. (emphasis added).

79. *Braniff*, 700 F.2d at 943.

prospect of a growing misapprehension of the scope of § 365(c)(1)(A). This misapprehension stems, in part, from the initial mistake of courts which interpret the scope of § 365(f)(1) as encompassing general proscriptions against assignment, thus necessitating an interpretation of § 365(c)(1)(A) as of lesser scope that the general rule set forth in § 365(f)(1).

To understand the error plaguing courts such as the *Lil' Things* court, we return to the applicable law which was deemed by the *Lil' Things* court to be inapplicable under § 365(c)(1)(A). Recall, the statute at issue, Texas Property Code § 91.005 provided that a tenant may not lease his interest in a leasehold without the landlord's consent. This provision has been held by Texas courts to apply to assignments as well as subleases.[80] By providing, statutorily, that leasehold assignments may not be made absent consent of the landlord, the statute is stating that the landlord may excuse himself from accepting performance from the assignee of the contract, or may excuse himself from performing his end of the contract. In fact, the very case cited by the *Lil' Things* court for the proposition that the Texas statute is merely a general prohibition against assignments, *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*,[81] makes exceedingly clear this very proposition.

In *Twelve Oaks*, the Texas Court of Appeals stated that an assignment without the landlord's consent does not vitiate the lease. However, if the lease is assigned without the landlord's consent, the landlord has the option of accepting performance, *i.e.*, a tacit consent, or the landlord may undertake "to terminate [the lease] or declare a forfeiture or reenter."[82] The *Twelve Oaks* court continued, "because the provision [in the statute] is for the landlord's benefit, only he may complain of the wrong done by such assignment."[83] The statute is for the landlord's benefit. In other words, the option whether to be bound or to be excused is the lessor's. Thus, the practical operation of the Texas law is to provide a certain party (the landlord) an excuse by which he may legally evade receipt or provision of performance under a lease if that lease is assigned by a lessee. This fits exactly within the parameters of § 365(c)(1)(A)—applicable law that excuses a party from rendering or accepting performance, whether or not the contract contains an anti-assignment clause.

Why, then, do courts such as the *Magness, James Cable*, and *Lil' Things* courts conclude that § 365(c)(1)(A) must be limited to a "materiality of identity" standard? As stated previously, the error lies in these courts' initial perception that what is actually described by § 365(c)(1) cannot be found there because it is also found in § 365(f)(1), which eradicates it. Interpreting the reference in § 365(f)(1) to "applicable law" as referring to those laws which make a general prohibition against assignments, sets up the interpretation that § 365(c)(1) must refer to "applicable law" of lesser scope than that outlined in § 365(f)(1). These courts, however, have ignored the fact that § 365(f)(1) describes a larger universe of "applicable law" than general restrictions on assignment, and can only have effect after the laws enforceable through § 365(c) are excluded from its effect. As recognized by the First Circuit in the *Pioneer Ford* case, laws which enforce provisions of contracts purporting to prohibit or restrict assignment

---

80. *See, supra.* n. 70.

81. 938 S.W.2d 102 (Tex.Ct.App.1996).

82. *Id.* at 112.

83. *Id.*

of contracts also fall within the ambit of § 365(f)(1). So too might a law which states that contracts of a certain sort cannot be assigned if the contract is in default, or which conditions assignability upon cure of default or upon performance of some other condition contained within the contract. Such a law would be dependent upon the inner workings of the provisions contained within the contract itself, and thus, would not be a law independent of the contractual provisions for its application.

■ The point to be made is that "applicable law" as referred to by § 365(c)(1)(A) is not limited by a "materiality of identity" standard. The only limitation imposed on the applicability of § 365(c)(1) is that the "applicable law" restrict or prohibit assignment, *i.e.*, excuse performance, independent of the contract (*"whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties "*). Through this language, § 365(c)(1) decrees the requirement that the applicable law be independent of and not relate to the enforceability of prohibitions on assignment or restrictions upon delegation on duties within the language of the contract itself.[84] If the law acts as a general prohibition on assignment, which, as has been discussed, is nothing more than a legal excuse for one party to refuse to perform or accept performance, and the law acts independent of any provision in the contract calling for a restriction on transfer, the law should be enforced against the trustee via § 365(c)(1).

■ This requirement of independence from restrictions within the contract is the crucial distinction between laws which are encompassed by § 365(c)(1), and those which are not excepted from § 365(f)(1) pursuant to the introductory clause of that subsection ("Except as provided in subsection (c) of this section") and are therefore nullified by that section. "Applicable law" referenced in § 365(f)(1) includes, without limitation, all laws that prohibit, restrict, or condition assignment. However, specifically excepted are laws covered under § 365(c)(1). As has been discussed, § 365(c)(1) covers all laws which, regardless of a provision in a contract, act to bar assignment. What, then, is left for § 365(f)(1)? As recognized by the First Circuit in *Pioneer Ford*, in addition to covering generally applicable prohibitions on assignment, § 365(f)(1) also applies to specially applicable anti-assignment laws— laws which operate to bar assignment, but which are dependent in application upon provisions contained within the contracts themselves. This is the only cogent interpretation of the interplay between §§ 365(c)(1) and (f)(1).[85]

---

84. While this Court does not find the statute to be ambiguous, and therefore, does not resort to legislative history and statements as a basis for its determination, the Court notes, nonetheless, that the House and Senate reports regarding § 365(c) bear out the interpretation of an independence requirement. See, H.R.Rep. No. 595, 95th Cong. 1st Sess. 348 (1977); S.Rep. No. 989, 95th Cong.2d Sess. 59 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6304, 5787, 5845 ("This prohibition applies only in the situation in which applicable law excuses the other party from performance *independent of any restrictive language in the contract or lease itself.*") (emphasis added)

85. The majority in *Magness* took issue with the First Circuit's conclusion that "applicable law" referenced in § 365(f)(1), in effect, referred only to that law which was dependent in operation upon a prohibition or restriction in the contract itself. The *Magness* court stated. "There is simply nothing in the language of § 365(f) which supports the limitation read into it by that court." *Magness*, 972 F.2d at 695. What the *Magness* court failed to realize is that this conclusion is dictated by the language of the two sections combined.

For illustration, the Court offers an example from Louisiana law to support its interpretation of the interplay between § 365(c)(1) and (f)(1). As noted previously, *supra*, note 68, Louisiana contract law divides types of obligations (of which contracts are a subspecies termed "conventional obligations) into two categories— those which are heritable, and those which are strictly personal".[86] Heritable obligations are defined by Louisiana Civil Code article 1765, which states, "An obligation is heritable when its performance may be enforced by a successor of the obligee or against a successor of the obligor." Strictly personal obligations, in turn, occur when "An obligation can be enforced only by the obligee, or only against the obligor." [87]

In conjunction, these two articles cover all types of obligations. Heritable obligations can be transferred or assigned. Performance can be enforced by or against successor parties to the contract. In contrast, those obligations which are strictly personal cannot be transferred or assigned because performance can only be enforced by the obligee or only against the obligor. If an obligation is strictly personal, performance cannot be enforced by or against any party other than the original parties to the contract. Strictly personal obligations, however, are not the same thing as personal services contracts. Article 1766 of the Louisiana Civil Code includes the presumption that personal services contracts or contracts requiring the special skill or qualification of the obligor are strictly personal obligations. The existence of these special sub-categories of personal obligations and the presumptions associated with them requires that we understand the strictly personal obligation as broader than personal services obligations. Regarding assignment of rights, the Civil Code provides, generally through Article 2642, that "All rights may be assigned, with the exception of those pertaining to obligations that are strictly personal." Another Code article, however, provides that "A right cannot be assigned when the contract from which it arises prohibits the assignment of that right ..." [88]

The Louisiana Civil Code contains an overriding general presumption that all obligations are heritable (assignable). Louisiana Civil Code article 1765 states, "Every obligation is deemed heritable as to all parties, except when the contrary results from the terms or from the nature of the contract." Thus, a heritable obligation may be converted to one which is strictly personal by the terms of the contract, *i.e.*, a provision prohibiting assignment or delegation of the rights and duties under the contract.

A contract may be converted, therefore, from one which contains rights and obligations that are freely transferrable to one containing non-transferrable, or strictly personal rights and obligations, through contract language embodied in Louisiana law, as in article 1765, upholds such restrictions. This component of Article 1765, however, does not fall within § 365(c)(1), so as to prohibit assumption and assignment, because it does not act to excuse receipt or provision of performance independent of the terms of the contract itself. Stated another way, in the case of a heritable obligation converted to a strictly personal obligation by virtue of a term contained within the contract, articles 1765 and 1766, which uphold that conversion from heritable to strictly personal, do not excuse performance without regard to the

---

86. *See,* La. Civ.Code arts. 1765, 1766.

87. La. Civ.Code art. 1766.

88. La. Civ.Code art. 2653.

terms of the contract ("whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties ..."). The strictly personal character (the non-transferable character) is dependent upon the inclusion within the contract of a term prohibiting assignment or transfer.

An obligation, however, may also escape heritable character by virtue of its nature.[89] Article 1766 details those obligations whose nature is such that they are, of themselves, presumed to be strictly personal in character—those obligations under which the performance requires the special skill or qualification of the obligor, or when the performance is intended solely for the benefit of the obligee. As noted previously, the performance of a certain band, or attorney (dependent upon the special skills or qualifications of the obligors) is a strictly personal obligation by its nature. Also, obligations in which the obligee is to benefit exclusively, such as an agreement to forbear suit, i.e., a release, against a specific person, are inherently personal in character. Such obligations may not be transferred because performance is limited strictly to the parties originally involved in the contract.

However, there is another source of a contract's nature; applicable substantive law governing the particular type of agreement and the rights and obligations thereunder. For example, under article 2812, a partner may share his interest in the partnership with a third person, but cannot transfer his partnership interest such that he makes that person a partner without the consent of the other partners.[90] Article 2812, therefore, is generally applicable to partnership contracts without regard to whether the partnership contract contains a restriction on transfer. The law makes the obligation and rights non-transferrable and by this general imposition of non-assignability (without regard to the contract), the obligations is by its nature strictly personal.

Another example of substantive law that effects the same result is the Louisiana law containing the requirement that no assignment or sublease of a mineral lease of state property can be valid without the consent of the State Mineral Board.[91] The restriction on transfer, applicable to all contracts, regardless of the contracts' inclusion of such a restriction, causes the contract to be rendered strictly personal by means of the statutory prohibition upon assignment. The strictly personal nature of the contract requires that it be applicable to prohibit assignment under § 365(c).

Our analysis comports completely with that of the Fifth Circuit in *Braniff*, which dealt with a contract involving rights that were not solely grounded in the personal character of the contracting party.

---

**89.** La. Civ.Code art. 1765.

**90.** *See, Stumpf v. McGee* (*In re O'Connor*), 258 F.3d 392 (5th Cir.2001).

**91.** *See* La. R.S. 30:128, which reads as follows:

No transfer or assignment in relation to any lease shall be valid unless approved by the State Mineral Board.

*See also,* La. R.S. 30:143(A), which contains the same prohibition regarding leases producing solid minerals.

In addition to the provisions of R.S. 30:128, in the case of a proposed transfer, under the circumstances described in Subsection B hereof, of any lease or sublease entered into by or under the authority of or subject to the jurisdiction of the State Mineral Board which includes the development and production of solid minerals, the board shall determine whether to approve such proposed transfer pursuant to this Section and to such rules and regulations as may be issued hereunder.

Our analysis would yield a different result in both *James Cable* and *Lil' Things*. Each of these cases involved generally applicable law containing a restriction on transfer that was independent of contractual restrictions. In each case, the applicable law rendered the nature of the contract, in Louisiana parlance, strictly personal. In each of the cases, § 365(c)(1) should have been seen as obligating assignment because of applicable law examining the non-debtor from accepting performance from an assignee.

Our analysis reads §§ 365(c) and 365(f)(1) to be cohesive, without conflict. Section 365(c) deals with a certain type of contract right. If the rights and obligations are covered by § 365(c), they are not included in the types of contract rights and obligations included in § 365(f), 91 Section 365(f)(1), simply, deals with what is left.

The strictly personal obligation, then, is properly seen under Louisiana law as (with the corresponding right) one that is not assignable or transferrable. If an obligation is of a particular sort, that of personal services, the obligation is presumed to be strictly personal. However, the general attribute of the strictly personal obligation is that it is non-assignable. It is the non-assignability that determines the nature of the obligation. Non-assignability can be gleaned from the nature of the contract itself, obtained through analysis of the contract against the backdrop of Article 1766. Or, as we will see, it can be gleaned from the contract. Or, it can be gleaned through analysis of the contract against applicable law that determines, particularly, the non-assignability of the rights and obligations.

▇▇▇ This Court concludes, therefore, that generally applicable laws which restrict or prohibit transfer of rights or duties under contracts (thereby excusing performance for the non-transferring party) independent of any restriction contained within the contract itself, are covered by the provisions of § 365(c)(1). Thus, such laws may be enforced against the bankruptcy trustee to prohibit or restrict the trustee's attempt to assume and assign such contracts. However, laws for which operation of that law is dependent upon contractual provisions prohibiting, restricting, or conditioning transfer are not excepted from § 365(f)(1) by § 365(c)(1), and are not enforceable against a trustee seeking to assume and assign a contract of the debtor.

Returning to the instant case, if Franke–Misal can show that a generally applicable law prohibits assignment of the Agreement, independent of the provision in the Agreement which purports to restrict assignment, then the Trustee may not assume and assign the contract. If, however, the applicable law is dependent upon the inclusion within the Agreement of a contraction provision to prohibit or restrict such a transfer, it is not covered by § 365(c)(1), and such law (along with any transfer restrictions contained within the Agreement) can be ignored by the Trustee and the Agreement can be transferred.

## B. THE PURPORTED "APPLICABLE LAW" PROHIBITING ASSIGNMENT OF THE AGREEMENT

Does generally applicable law prohibit the assignment of the Agreement regardless of the existence within the Agreement of an restriction on assignment? Franke–Misal, first, points to a long-standing rule of federal common law that non-exclusive patent licenses may not be assigned (without the consent of the patentee). Franke–Misal's argument stems, in part, from the recent decisions of the Ninth Circuit in *In*

*re Catapult Entertainment, Inc.* and *In re CFLC, Inc.*,[92] which held that non-exclusive licenses of patented property could not be assumed and assigned pursuant to § 365(c)(1).

In both *Catapult* and *CFLC*, the Ninth Circuit found that federal common law regarding the assignability of non-exclusive patent licenses prohibited assignment of the licenses without the patentee/licensor's consent, regardless of restrictions within the contract, and that applicable law therefore excused the patentee/licensor from accepting or rendering performance from a third party. Pursuant to § 365(c)(1), the non-exclusive licenses could not be assumed or assigned by debtor corporations.

The rule of federal common law adhered to by the Ninth Circuit has its genesis in an 1852 decision of the United States Supreme Court, *Troy Iron & Nail Factory v. Corning.*[93] In *Corning*, the inventor of an improvement on machines used in manufacturing nails and spikes assigned his patent on the improvement to the Troy Iron & Nail Factory ("Troy Iron"). In the assignment agreement, the inventor, Henry Burden ("Burden"), also agreed to assign any patents on future improvements made upon the original patented improvement. Thereafter, Burden patented another improvement on the nail and spike machinery and, pursuant to the previous agreement, assigned the same to Troy Iron.

It is unclear from the opinion of the court why, but for some reason, Burden then sought to hold the defendants liable for infringement of the second patent. Af-

ter a trial, the district court awarded Burden a judgment. Thereafter, Burden again became aware that the defendants were continuing to use the second improvement patented by Burden and he sought to permanently enjoin the defendants use of the improvement. During the pendency of this litigation, Burden and the defendants settled the litigation. In settling the litigation, the parties constructed a release agreement whereby the defendants and Burden released all claims against each other (apparently the defendants claimed to have patents on the same improvements, though such claims were doubtful). In addition, the agreement stated, "it is further agreed, that the said parties may each hereafter manufacture and vend spikes, of such kind and character as they see fit, notwithstanding their conflicting claims to this time." [94]

Subsequently, Troy Iron instituted an action to enjoin the defendants from infringing the second patent which was assigned to them by Burden. Troy Iron claimed that the defendants had been using the same since October 14, 1845, the same day as the date the release agreement in the Burden suit was signed. Troy Iron sought an accounting of profits and an injunction prohibiting the defendants use of the second patented improvement.

The defendants, relying on the language quoted above, claimed that the release agreement in the Burden suit provided them with authority to use the improvement because it, alternatively, granted them an interest in the second patent, or granted them a license to use the improvement. The Supreme Court found, howev-

---

**92.** *Perlman v. Catapult Entertainment, Inc.* (*In re Catapult Entertainment, Inc.*), 165 F.3d 747 (9th Cir.1999); *Everex Systems, Inc. v. Cadtrak Corp.* (*In re CFLC, Inc.*), 89 F.3d 673 (9th Cir.1996); *see also, In re Access Beyond Technologies, Inc.*, 237 B.R. 32 (Bankr.D.Del. 1999).

**93.** 55 U.S. (14 How.) 193, 14 L.Ed. 383 (1852).

**94.** *Id.* at 211.

er, that the language did not provide the defendants with an interest in the patent itself, but at most a license (non-exclusive because both Burden and the defendants had a right to use the improvement). Although not clearly stated in the Supreme Court's opinion, from the decree of the Supreme Court determining that the defendants had infringed Troy Iron's rights under the second Burden patent, it can be inferred that the Supreme Court found that the license was null as having been given in contravention of the rights which Troy Iron held in the patent. In other words, Troy Iron, as assignee of the second Burden patent, was the only party who could grant a license to the defendants, and Troy Iron did not do so.

In making that determination, however, the Supreme Court's opinion contained the following language, which seems to have become the fountainhead for future courts to develop the rule that non-exclusive licenses are not assignable absent consent of the licensor. Pertinently, the Supreme Court stated:

> Though no form has been prescribed, either for assignments of patents or for licenses to use them, we have judicial decisions concerning both which are to determine what language will make either, and how they are to be distinguished from each other... The difference is well understood. A mere license to a party, without having his assigns or equivalent words to them, showing that it was meant to be assignable, is only the grant of a personal power to the licensees, and it not transferable by him to another.[95]

This language was used as a basis for the Supreme Court's decision in *Oliver v. Rumford Chem. Works*.[96] In *Rumford Chemical,* the Rumford Chemical Works ("Rumford") obtained a patent for an improvement in the preparation of certain acids and phosphates used in food preparation. Thereafter, Rumford granted to Allen Morgan the exclusive right to use the patented chemicals in the manufacture of self-rising flour within a territory encompassing parts of Tennessee, Mississippi, and Alabama. This "exclusive" right was to exist for a period of five years from the date of the written agreement.

Shortly after confecting the agreement under which Rumford granted Allen Morgan rights to use the chemicals, Allen Morgan died. Mr. Morgan was survived by his wife, Kate Morgan. After Kate Morgan remarried, she and her new husband brought suit (in the name of Rumford) against, *inter alia,* J.N. Oliver ("Oliver"). The suit alleged that Oliver and his company had infringed upon the rights originally granted Allen Morgan for the use of the patented chemicals in the manufacture of self-rising flour. The plaintiffs theorized that upon Allen Morgan's death, his wife, Kate Morgan, succeeded to all his personal assets, among which was the exclusive right granted from Rumford. After a trial, the district court returned a verdict in the plaintiffs' favor and awarded damages.

On appeal, the Supreme Court noted that what was granted to Allen Morgan was only the exclusive right to use, within a specified territory, the patented chemicals in making a self-rising flour, and to sell the flour within that territory. The chemicals to be used in the making of the flour were to be purchased solely from Rumford. The agreement did not grant a right to make the acid. According to the Court, then:

---

**95.** *Id.* at 216.

**96.** 109 U.S. 75, 3 S.Ct. 61, 27 L.Ed. 862 (1883).

[Allen] Morgan was not an assignee of the entire right secured by the patent, nor of any undivided part of such entire right, nor of the exclusive interest in such entire right for the territory specified. He did not acquire the whole of the exclusive right or legal estate vested in the Rumford Chemical Works by the patent for the said territory, leaving no interest in his grantor for that territory, as to anything granted by the patent.[97]

Accordingly, the right granted Allen Morgan was not an assignment, but rather a license. Consequently, "the instrument of license is not one which will carry the right conferred to any one but the licensee personally, unless there are express words to show an intent to extend the right to an executor, administrator, or assignee . . ."[98] Upon the death of Allen Morgan, the license could not be transferred via testamentary disposition or otherwise to his wife, and therefore, because the license lapsed, she could not maintain suit against Oliver for infringing her rights under the lapsed license.

Following the *Rumford Chemical* case, the Supreme Court again took up the issue of assignability of license rights in *Hapgood v. Hewitt.*[99] In *Hewitt,* an employee, Horace Hewitt, of Hapgood & Co., a Missouri corporation engaged in the manufacture and marketing of plows, invented an improvement on a certain type of iron plow. During Mr. Hewitt's employment with Hapgood & Co., the company used the improved parts, with Mr. Hewitt's knowledge, in the manufacture of iron plows. After his employment with Hapgood & Co. ceased, Mr. Hewitt applied for

and received a patent on parts of the iron plow.

Thereafter, Hapgood & Co. was dissolved and a new Illinois corporation formed, Hapgood Plow Company. During the dissolution of Hapgood & Co., Hapgood & Co. assigned all its rights and assets to Hapgood Plow Co., allegedly including the rights to the patent on the plow parts issued to Mr. Hewitt. After Mr. Hewitt refused to transfer the patent to Hapgood Plow Co., Hapgood Plow Co. sued to require such a transfer.

After losing in the lower court, Hapgood Plow Co. appealed to the Supreme Court. The Supreme Court affirmed the decision of the district court which found that Mr. Hewitt was not employed for the purpose of exercising his inventive faculties for the benefit of his employer, and thus, the company did not have ownership rights in the patent, but rather "shop rights," or an implied license to use the invention of its employee. As the right granted to Hapgood & Co. was in the form of a license, the Court stated:

> Whatever license resulted to the Missouri corporation, from the facts of the case, to use the invention, was one confined to that corporation, and not assignable by it... As to any implied license to the assignor, it could not pass to the assignee.[100]

Since the decisions by the Supreme Court in *Corning, Rumford Chemical,* and *Hewitt,* a number of lower courts have held that non-exclusive licenses of patents are not assignable.[101] This pattern was

---

**97.** *Id.,* 109 U.S. at 82, 3 S.Ct. at 65.

**98.** *Id.*

**99.** 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369 (1886).

**100.** *Id.,* 119 U.S. at 234, 7 S.Ct. at 197.

**101.** *See, e.g., Waterman v. Shipman,* 55 F. 982, 986 (2nd Cir.1893); *Bowers v. Lake Superior Contracting & Dredging Co.,* 149 F. 983, 986 (8th Cir.1906); *Rock–Ola Mfg. Corp. v. Filben Mfg. Co.,* 168 F.2d 919, 922–923 (8th Cir. 1948); *Unarco Indus., Inc. v. Kelley Co.,* 465 F.2d 1303, 1306 (7th Cir.1972); *PPG Indus.,*

recognized by the Ninth Circuit in its *Catapult* and *CFLC* decisions as a rule of federal common law acting to preempt general state laws on assignability of non-exclusive licenses.[102]

Exposing this "rule of federal common law," however, does not end this Court's inquiry.[103] Certainly, if this rule of federal common law is the applicable law, if the contract at issue is a non-exclusive license, the provisions of § 365(c)(1) would enforce such a transfer restriction against the trustee. To determine whether this rule of federal common law applies, though it is first necessary for the Court to determine whether what type of contract the Agreement is. Is this contract is a non-exclusive license expressly covered by the rule of federal common law stated above, or is the contract some other kind of transfer of patent rights to which the rule impliedly extends, or is the contract one that is not governed by the prohibition on assignment of licenses of patented technology? The Court must construe the contract to determine what type of rights were granted to SNF and withheld by Franke–Misal, and must determine whether the transfer of rights embodied within the Agreement causes the Trustee to be bound to suffer the general prohibition on transfers of non-exclusive patent licenses.

## C. WHAT TYPE OF CONTRACT IS THE AGREEMENT?

It is clear on the face of the document that the Agreement is not a non-exclusive license, except to the extent that the Agreement does not cover food categories other than those specified. For those food categories specified, the Agreement grants SNF the right, exclusive of all others including Franke–Misal, to "make, have made, use, sell and import licensed products ..." It is not even seriously contended by the parties that the Agreement is a non-exclusive license regarding the specified food categories. Rather, the Agreement embodies an exclusive license giving SNF the exclusive rights to use the patented process in the manufacture of certain foods.

It would seem, then, that the next question to be determined by the Court is whether the rule of federal common law prohibiting assignments of non-exclusive patent licenses extends to exclusive licenses. Before answering that question, however, the Court pauses to determine whether the Agreement is merely an exclusive license or whether the Agreement comprises something more, *i.e.*, an assignment of certain patent rights.

*Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1093 (6th Cir.1979); *accord, Haffcke v. Clark*, 50 F. 531, 536 (4th Cir.1892).

**102.** See, *CFLC*, 89 F.3d at 679; *Catapult*, 165 F.3d at 750. Both *CFLC* and *Catapult* expressly confine their holdings to non-exclusive licenses. See, *Catapult*, 165 F.3d at 750, n. 3 ("we express no opinion regarding the assignability of *exclusive* patent licenses under federal law, and note that we expressed no opinion on this subject in Everex.") (emphasis in original).

**103.** The Court notes several scholars have recently questioned whether courts, at least in the post-*Erie* era (*Erie R. Co. v. Tompkins*, 304

U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)), have erred in creating this federal common law rule regarding assignability of patent licenses. See, *e.g.*, Wilson, *Patent License Assignment: Preemption, Gap Filling, ad Default Rules*, 77 B.U. L.Rev. 895 (Oct.1997); Quinn & Weide, *Violation of the Erie Doctrine: Application of a Rule of Federal Common Law to Issues of Patent License Transferability*, 32 Creighton L.Rev. 1121 (Apr.1999); Fellmeth, *Control without Interest: State Law of Assignment, Federal Preemption, and the Intellectual Property License*, 6 Va. J.L. & Tech. 8 (Spr.2001). As will become apparent, however, this Court need not decide this issue.

## 1. Rights Created By Patent

To encourage disclosure of new inventions and discoveries, the United States Constitution vested Congress with the power to grant patents to inventors.[104] Pursuant to this constitutional grant of power, Congress has enacted Title 35, United States Code, which provides, *inter alia,* for the establishment of a patent office and sets forth standards for patentability of discoveries and inventions. In addition, Title 35 sets forth the scope of the rights granted to inventors under and patent, and the duration for those rights.[105] Specifically, 35 U.S.C. § 154 states:

> Every patent shall contain ... a grant to the patentee, his heirs or assigns, for the term of seventeen years, ... of the right to exclude others from making, using, or selling, the invention throughout the United States ...

The import of this federal grant of exclusivity is that is does not grant the patentee the right to use the discovery or invention. The patentee has this right even without the issuance of a patent; the patentee could choose not to disclose the invention, or to use it without the grant of exclusivity afforded by the patent statutes.[106] What the statute does grant, however, is a right of exclusion.[107] In the words of Justice McKenna:

The patent law is the execution of a policy having its first expression in the Constitution, and it may be supposed that all that was deemed necessary to accomplish and safeguard it must have been studied and provided for. It is worthy of note that all that has been deemed necessary for that purpose ... has been to provide for an exclusive right to inventors to make, use, and vend their inventions. In other words, the language of complete monopoly has been employed .... [T]he inventor could have kept his discovery to himself; but, to induce a disclosure of it, Congress has, by its legislation, made in pursuance of the Constitution, guaranteed to him an exclusive right to it for a limited time, and the purpose of the patent is to protect him in this monopoly,—not to give him a use which he did not have before, 'but only to separate to him an exclusive use.' ... *The inventor is one who has discovered something of value. It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention.*[108]

104. *See,* U.S. Const., Art. 1, § 8, cl. 8 ("The Congress shall have the Power ...To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.")

105. *See,* 35 U.S.C. § 154; see also, 35 U.S.C. § 173 (design patents are granted for a term of fourteen years).

106. *See, Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 424, 28 S.Ct. 748, 753, 52 L.Ed. 1122 (1908).

107. *See, Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 14 L.Ed. 532 (1852) ("The fran-chise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that [the patentee] obtains by the patent."); *see also, Gayler v. Wilder,* 51 U.S. 477, 493, 10 How. 477, 13 L.Ed. 504 (1850) ("The inventor of a new and useful improvement certainly has no exclusive right to it, until he obtains a patent. This right is created by the patent, and no suit can be maintained by the inventor against any one for using it before the patent is issued.").

108. *Eastern Paper Bag,* 210 U.S. at 423–424, 28 S.Ct. at 753 (citations omitted) (emphasis added).

Congress has provided that this power of exclusion, or monopoly power, granted under a patent shall be considered property of the patentee, with the attribute that the patentee may sell or assign the right to exclude to others.[109] Whether a patent has been assigned, however, is a question of federal law.[110]

### 2. Assignment or License?

 It has long been held by the courts that when construing whether an agreement as to patent rights constitutes an assignment or a license, the substance, not the title, of the agreement controls.[111] Speaking on the issue of whether an agreement constitutes a license or assignment, Chief Justice Taney stated in *Wilder*:

> ... the patentee may assign his exclusive right within and throughout a specified part of the United States, and upon such an assignment the assignee may sue in his own name for an infringement of his rights. But in order to enable

him to sue, the assignment must undoubtedly convey to him the entire and unqualified monopoly which the patentee held in the territory specified,—excluding the patentee himself, as well as others. And any assignment short of this is a mere license.[112]

 The crucial concepts regarding assignment versus license, as elucidated by Chief Justice Taney are that the purported assignment convey the entire and unqualified monopoly, at least regarding a specified territory. The Supreme Court elaborated on the concept of patent assignment in *Waterman v. Mackenzie*,[113] wherein the Supreme Court stated:

> The monopoly thus granted is one entire thing, and cannot be divided into parts, except as authorized by those laws. The patentee or his assigns may ... assign, grant, and convey, either (1) the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or (2) an undivided part or share of that exclusive

---

**109.** *See,* 35 U.S.C. § 261.

**110.** *See, Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 33, 43 S.Ct. 254, 255, 67 L.Ed. 516 (1923) ("The bill in this case is based on an assignment of a patent claimed to be valid under the statutes of the United States .... It therefore involves the validity of the assignment of a patent, which is a question arising under the patent laws because it depends upon their construction ...."); *see also, Gayler v. Wilder,* 51 U.S. 477, 494, 10 How. 477, 13 L.Ed. 504 (1850) ("Now the monopoly grated to the patentee is for one entire thing; it is the exclusive right of making, using, and vending to others to be used, the improvement he has invented, and for which the patent is granted. The monopoly did not exist at common law, and the rights, therefore, which may be exercised under it cannot be regulated by the rules of the common law. It is created by the act of Congress; and *no rights can be acquired in it unless authorized by statute, and in the manner the statute prescribes.*") (emphasis added). The

existence of an assignment *vel non,* however, is to be contrasted with other determinations construing provisions of the contract itself, and the workings of those provisions, such as royalty payments, termination rights, etc, which are guided by state law. *See, Lear, Inc. v. Adkins,* 395 U.S. 653, 661–662, 89 S.Ct. 1902, 1906–1907, 23 L.Ed.2d 610 (1969).

**111.** *See, Waterman v. Mackenzie,* 138 U.S. 252, 256, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891) ("Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions."); *see also, CMS Indus., Inc. v. L.P.S. Int'l, Ltd.,* 643 F.2d 289, 294 (5th Cir.1981); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875 (Fed.Cir.1991).

**112.** *Wilder,* 51 U.S. at 494.

**113.** 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891).

right; or (3) the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, ...and vests in the assignee a title in so much of the patent itself .... Any assignment or transfer, short of one of these, is a mere license, giving the licensee not title in the patent .... [114]

The principles enunciated by the Supreme Court in *Mackenzie* still hold sway among courts charged with a determination of whether an agreement constitutes a license or assignment.[115]

In the instant case, it is clear that whatever rights were granted to SNF under the Agreement, the Agreement was not an assignment of the whole of the patents or of an undivided interest in the patents. The exclusive rights granted by the patents is to make use and vend food products using a particular process. The rights granted under the Agreement were specifically limited to making certain foods, *i.e.*, snack foods and cheese, by using the process, and the right to sell certain foods manufactured through the use of the patented process, reserving to Franke–Misal the rights to all other classes of foods covered by the patents. The Agreement does not transfer the whole of the patent rights—Franke Misal retains the patent monopoly on foods not covered by the Agreement. As well, the Agreement does not purport to convey a fractional interest in the whole monopoly granted by the patents. Therefore, the Agreement cannot constitute an assignment under the first or second prongs of the *Mackenzie* test.

Under the third *Mackenzie* prong, if the Agreement transferred "the exclusive right under the patent within and throughout a specified part of the United States," the Agreement may be considered an assignment, at least regarding the monopoly rights for that specific territory. This prong, however, requires a transfer of all rights granted under the patent for a definite region of the United States. As stated previously, the Agreement does not convey all rights under the patents. It does, seemingly convey all rights under the patents to a limited category of items, but it does not convey the entirety of the rights granted to Franke–Misal by the patents as the Agreement does not extend to the complete realm of foods to which the patented process reaches.

The Fifth Circuit confronted an identical issue in *Etherington v. Hardee*.[116] In *Etherington*, a patent holder granted to the plaintiff, "the exclusive, irrevocable, royalty-free license" with respect to a certain category of products, above-ground mud guns and line jets, which were covered by its patent.[117] The plaintiff brought suit against the defendant alleging infringement of his exclusive rights to make, use, and sell the above-ground mud guns and line jets. After the district court dismissed the plaintiff's action for lack of standing, the plaintiff appealed arguing that its "license" was, in fact, in the nature of an assignment such that it had the right to bring an infringement action on its own behalf without the necessity of joining the original patent holder.

The Fifth Circuit affirmed the district court's dismissal. The court stated:

114. *Id.*, 138 U.S. at 255, 11 S.Ct. at 335 (citation omitted).

115. *See, e.g., Vaupel*, 944 F.2d at 873–874. *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed.Cir.1995);

116. 290 F.2d 28 (5th Cir.1961).

117. *Id.*, 290 F.2d at 28.

Since the leading case of *Wateman [Waterman] v. Mackenzie*, it has been held that where the patentee has granted the exclusive right under the patent throughout a specified part of the United States, the grantee is an assignee .... The [plaintiff] poses the question, 'Since a geographical transferee can sue in his own name alone, why can't an industry wide transferee sue in his name alone?' ... The answer may be found, we think, in the enactments of Congress and the decisions of the Courts. By statute it is provided that a patentee may grant and convey an exclusive right under this patent to the whole or any specified part of the United States.... [T]o entitle an assignee or grantee to maintain such suit ... such assignee or grantee must have an assignment, grant or conveyance, either of the whole patent, of an undivided part of it, or of an exclusive right under it 'within and throughout a specified part of the United States.' [118]

The court thus reasoned that the grant of a right of limited use, though it may be exclusive in nature for that particular limited use, nonetheless, is not a full grant of the rights under a patent, of an undivided interest in the patent, or of the full rights in a patent in a certain definable territory. Therefore, the plaintiff held a license which did not carry with it standing to sue in the plaintiff's own name without the joinder of the patent holder.

While the analysis of the Fifth Circuit is less than crystalline, the holding of the case is based upon the Supreme Court's decision in *Pope Mfg. Co. v. Gormully &*

*Jeffery Mfg. Co.*[119] At issue in *Gormully* was the apparent assignment of patent rights relating to hammock saddles (seats?) on bicycles. The plaintiff alleged that it was the assignee of patent rights relating to a specific claim made under the patent to an adjustable hammock seat.[120] The plaintiff then brought suit against the defendant alleging that it was infringing upon the rights the plaintiff, as assignee, held in the patent.

On appeal, the Supreme Court framed the issue as, "whether a patentee can split up his patent in as many different parts as there are claims, and vest the legal title to those claims in as many different persons." [121] The court held that the patentee could not split up the rights granted under a patent in such a fashion. After reviewing the pronouncement in *Mackenzie* regarding the three situations in which a patentee may effect a transfer or assignment of his patent rights, the Supreme Court recited the reasoning of Chief Justice Taney in *Wilder* wherein the court held that a grant of the exclusive right to make and vend an article within a certain territory was only a license. Specifically, the *Wilder* court stated: ·

it was obviously not the intention of the legislature to permit several monopolies to be made out of one, and divided among different persons within the same limits. Such a division would inevitably lead to fraudulent impositions upon persons who desired to purchase the use of the improvement, and would subject a party who, under a mistake as to his rights, used the invention without au-

---

118. *Id.,* 290 F.2d at 29 (citations omitted).

119. 144 U.S. 248, 12 S.Ct. 641, 36 L.Ed. 423 (1892).

120. It is clear that the an adjustable hammock seat was only one incident (or claim) to

which the patent applied. Apparently, the patent covered other aspects of hammock seats other than ones which were adjustable.

121. *Gormully,* 144 U.S. at 250, 12 S.Ct. at 642.

thority, to be harassed by a multiplicity of suits instead of one, and to successive recoveries of damages by different persons holding different portions of the patent-right in the same place.[122]

Based upon this pronouncement, the *Gormully* court then reasoned:

> While it is sometimes said that each claim of a patent is a separate patent, it is true only to a limited extent. Doubtless separate defenses may be interposed to different claims, and some may be held to be good and others bad, but *it might lead to very great confusion to permit a patentee to split up his title within the same territory into as many different parts as there are claims. If he could do this, his assignees would have the same right they now have to assign the title to certain territory, and the legal title to the patent might thus be distributed among a hundred persons at the same time.*[123]

Therefore, the purported assignment of patent rights to a limited aspect of the total rights covered by the patent was deemed a license.

The issue faced by the *Etherington* and *Gormully* courts is almost identical to the one at issue before this Court. In this case, the Agreement purports to grant an exclusive right to make, use, and vend, but exclusivity of that right is limited solely to two food categories among all food categories which are sheltered under the patent. To characterize this grant as an assignment of the patent rights would, in effect, allow SNF to further break down the patent, and assign the exclusive right to use the Franke–Misal process in the manufacture of potato chips, or bagel chips, and assign the rights under the patent to using the process to make low-fat cheese to a completely different party. Each of these parties could then further break the rights down into territorial boundaries, or even to different kinds of cheese (rights to cheddar to one and rights to Swiss to another) or potatoes (or bagels). The point is that the division of ownership, theoretically, could not be stopped and that the right to claim infringement under the patent could be so fractured as to make it impossible for a court to determine whether a right was infringed and to whom the right belongs. It is exactly this fear which prompted the Supreme Court long ago to require a passage of the whole of the patent, an undivided interest in the whole, or the territorial rights to the whole for such a grant to constitute an assignment.[124]

---

**122.** *Wilder,* 51 U.S. at 494.

**123.** *Gormully,* 144 U.S. at 252, 12 S.Ct. at 642–643 (emphasis added).

**124.** At this point, the Court notes the Supreme Court's decision in *Wilson v. Rousseau,* 45 U.S. (4 How.) 646, 11 L.Ed. 1141 (1846) could conceivably conflict with *Gormully* and *Etherington.* In *Rousseau,* it was held that an agreement granting the right to use two patented machines within the town of Watervliet, New York was an assignment of the right. Specifically, the Supreme Court stated:

> Although limited to the use of two machines within the town, the right to use them is exclusive. *No other party, not even the patentee, can use a right under the patent within the territory without infringing the grant.*

*Rousseau,* 45 U.S. at 686 (emphasis added). While it superficially appears that this language would encompass the Agreement presently at issue, since the Agreement grants the right to two categories of food exclusively to SNF and good even as against Franke–Misal, the right to use two machines in *Rousseau* did not, it appears from the language of the case, break the patent into individual parts. The patented process—improved planing and grooving of wood—was embodied in the machines themselves. The patent did not stretch to other machines. That the assignee was limited to the use of two such machines was of no moment. The patent *in toto* had passed

Based on the decisions in *Etherington* and *Gormully*, this Court concludes that the Agreement did not constitute an assignment of the exclusive rights to make and use the Franke–Misal process in the production of snack foods and cheese. Instead, the Agreement constitutes a license.

### D. DOES THE GENERALLY APPLICABLE LAW PROHIBIT ASSIGNMENT THE AGREEMENT

As discussed in Part IV(B) of these Reasons, the federal courts have developed a rule of law which prohibits the assignment of non-exclusive patent licenses without the consent of the patentee. The rule, simply stated, is that while ownership of patent rights is assignable, the rights granted under a non-exclusive license cannot inure to a third party, unless the licensor consents to such assignment.[125]

The rationale derives from the principle that the granting of a patent does not grant a person the right to use, make, or sell a product. The right to use, make, or sell one's own invention does not stem from the patent act. What is granted by a patent is the right to exclude others from using one's invention; thus, the language of the statute, "Every patent shall contain ... a grant to the patentee ... of the *right to exclude others* from making, using, or selling the invention ...."[126] The distinction is subtle, but critical, nonetheless.

By having the right to exclude others from the making, using, and selling of the invention, the patentee may choose to allow some parties to make, use, and or sell the invention free from fear of suit due to the patentee's power to exclude. Such is the nature of the concept of a patent license. A license of a patent is merely an agreement between the patentee and the licensee that the patentee will not sue the licensee for infringement of his exclusive right (in return for consideration of some sort). By granting a license, a patentee is not affirmatively granting any share of the patent right itself, but instead, is agreeing to forebear from suing the licensee for infringement of the patentee's rights under the patent.[127] The forbearance granted the licensee is personal in nature.[128] In effect, the licensor is saying to the licensee, "I will not sue *you.*" It would strain credulity to argue that a promise not to sue one person can be transferred by that person to another, thus preventing the licensor from suing the third party (to whom the licensor did not say, "I will not sue you."), without the consent of the person actually promising not to sue.

According to the Ninth Circuit the anti-assignment rule emanates from the fear that:

Allowing free assignability ... of non-exclusive patent licenses would under mine the reward that encourages invention because a party seeking to use the

to the assignee for the limited geographical area of Watervliet, New York.

**125.** *See, Stenograph Corp. v. Fulkerson,* 972 F.2d 726, 729, n. 2 (7th Cir.1992) ("Patent licenses are *not* assignable in the absence of express language.") (emphasis added).

**126.** 35 U.S.C. § 154 (emphasis added).

**127.** *See, General Talking Pictures Corp. v. Western Elec. Co.,* 304 U.S. 175, 181, 58 S.Ct. 849, 852, 82 L.Ed. 1273 (1938).

**128.** *See, Gilson v. Republic of Ireland,* 787 F.2d 655, 658 (D.C.Cir.1986) ("It is well settled that a non-exclusive licensee of a patent has only a personal and not a property interest in the patent and that this personal right cannot be assigned unless the patent owner authorizes the assignment or the license itself permits assignment.").

patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the marker for licenses under the patents. And while the patent holder could presumably control the absolute *number* of licenses in existence under a free-assignability regime, it would lose the very important ability to control the *identity* of its licensees. Thus, any license a patent holder granted—even to the smallest firm in the product marker most remote from its own—would be fraught with the danger that the licensee would assign it to the patent holder's most serious competitor, a party whom the patent holder itself might be absolutely unwilling to license.[129]

■■■■■ Given this generally applicable restriction on the transfer of non-exclusive licenses, it would seem then that the next task for this Court is to determine whether the general rule of federal common law prohibiting assignment of non-exclusive licenses extends to, and encompasses, exclusive licenses. However, even if the restriction does apply to exclusive licenses of the character embodied in the Agreement, the restriction is subject to consent. That is, the generally applicable prohibition on assignment may be vitiated by the consent of the licensor to the transfer.

In this case, the Agreement in Paragraph 15.1 states:

Neither this Agreement nor any portion or provision thereof may be assigned or otherwise transferred by LICENSEE without the express prior written consent of LICENSOR, *except incident to the sale of the substantial portion of LICENSEE'S assets . . .*

While the Agreement generally prohibits assignments, it carves out of this general prohibition a limited circumstance in which consent to assignment is given: "incident to the sale of the substantial portion of LICENSEE'S assets."

·An analogous situation was encountered by the Seventh Circuit in *Metropolitan Airports Comm'n v. Northwest Airlines, Inc (In re Midway Airlines, Inc.).*[130] In Midway Airlines, the debtor filed bankruptcy under chapter 11. Shortly after filing, it became apparent that the airline was not going to be able to reorganize, and therefore, the case was converted to a chapter 7 case and a trustee appointed. As part of the chapter 7 liquidation, the trustee sought to assume and assign a gate lease at the Minneapolis/St. Paul International Airport to Northwest Airlines. The Metropolitan Airports Commission ("Commission") objected to the proposed assumption and assignment claiming that its charter authority gave it the right to excuse its performance or from accepting performance from an assignee to whom it did not consent. However, the lease agreement itself specifically provided for assignment in bankruptcy provided adequate assurance of future performance was provided. The Commission argued that, notwithstanding this provision, § 365(c)(1) operated to bar the trustee's proposed assignment. Specifically, the Commission relied upon the language in § 365(c)(1) to the effect that assignment is barred against the trustee if applicable law bars assignment "whether or not such . . . lease prohibits or restricts assignment . . . or delegation . . ." Thus its contractual consent was irrelevant; applicable law prohib-

---

129. *CFLC,* 89 F.3d at 679 (emphasis in original).

130. 6 F.3d 492 (7th Cir.1993).

ited transfer without looking at the contract.

In rebuffing this argument, the Seventh Circuit reviewed the above quoted language of § 365(c)(1) and stated:

> But the lease at issue here is neither silent about assignment nor restrictive of it. Rather, it contains a provision that explicitly contemplates assignment by a trustee in bankruptcy....
>
> [The Commission] has contractually foresworn any right it may have had to object to the assignment of the lease by a bankruptcy trustee.[131]

Because the Commission consented to the assignment in the agreement, § 365(c)(1) did not apply. Essentially, the "whether or not" language in the statute refers to situations in which the contract either contains a restriction on transfer ("whether ... the contract or lease contains a prohibition or restriction"), or those in which the contract is silent on assignment (the reference to "or not"). If, however, the contract is not transfer prohibitive or silent on the issue of assignment, but rather is pro-assignment, applicable law must be such that performance or acceptance of performance would be excused regardless of the consent to transfer in the contract for the provisions of § 365(c) to apply.

The instant Agreement does contain a general restriction on transfer without consent of Franke–Misal. However, the Agreement by its very terms carves out an exception to this general rule by allowing assignment incident to a liquidation of all or substantially all of SNF's assets. The contract itself speaks of a situation in which predetermined consent is given.

The phrase "sale of the substantial portion of LICENSEE'S assets" is unambiguous, and to restate it in hopes of further explication would be nothing more than a redundancy. In this case, the court is presiding over the liquidation of all the assets of the bankruptcy estate of SNF, of which the Agreement comprises probably the most substantial asset, if not the only asset. Therefore, the Court finds that while liquidation of SNF in a chapter 7 bankruptcy case may not have been expressly on the minds of the parties when they confected the Agreement, the parties are nonetheless bound by the unequivocal, and unambiguous words of the contract, and that the liquidation of SNF's bankruptcy estate, which is comprised in "substantial portion" (if not the only portion) by the Agreement, falls within the purview of the language in the Agreement, "except incident to a sale of the substantial portion of the LICENSEE'S assets ..." Thus, consent to assign is expressed pursuant to the terms of the Agreement.[132]

Therefore, "applicable law," as referenced in § 365(c)(1) does not prevent the trustee's assumption and assignment because the "applicable law" in this case allows assignment if consent to assignment is given by the licensor within the Agreement. Like the Commission in *Midway Airlines*, Franke–Misal gave consent for the Agreement to be assigned under in certain circumstances. Applicable law, *i.e.*, the rule that licenses of patented inventions (or processes) are not assignable, carries with it the convention that if there are "express words to show an intent to extend the right to an assignee" the li-

---

**131.** *Id.* at 496.

**132.** *See,. Cyrix Corp. v. Intel Corp.,* 803 F.Supp. 1200, 1203, 1211 (E.D.Tex.1992) (License agreement assignable without the li-

censors consent due to provision in license contract allowing assignment to a purchaser of all or substantially all of the licensee's assets.).

cense may be assigned.[133] Therefore, if such words exist within the license itself, applicable law would not excuse the licensor from accepting or from rendering performance to such an assignee. As the Agreement evidences an intention on the part of Franke–Misal to allow assignment incident to a sale of all of the substantial assets of SNF, and the liquidation of SNF being essentially a sale of all of the substantial assets of that limited liability company (because the license is, for all intents and purposes, the only valuable asset SNF possesses), Franke–Misal is not excused from rendering or accepting performance to an assignee of SNF of the Agreement within the context of § 365(c)(1). Thus, § 365(c)(1) does not prohibit the assumption and assignment of the license to a third party.

Conceptually, then, our interpretative conclusion is that § 365(c)(1) only relates to applicable law prohibiting the enforcement of an assignment, regardless of language within the contract that **restricts** or **conditions** the right of assignment. The requirement that applicable law can be analyzed without regard to, or independent of, the language in the contract does not apply to language that allows assignment or provides the consent to assignment. There is no prohibition in § 365(c)(1) that precludes the contract from enforcing language of consent or language allowing assignment, in situations where absent the language the contract would not be assignable under applicable law. In other words, § 365(c)(1) is not applicable to prohibit assignment, if the parties have opted out of the generally applicable law prohibiting assignment, as long as the contractual assignability is enforceable under applicable non-bankruptcy law.

■ Franke–Misal, perhaps anticipating such a conclusion, points out that the provision allowing assignment also contains a further restriction on such consent. Specifically, the assignment provision of the Agreement allows for assignment incident to a sale of substantially all of the assets of SNF, "in which event the assignee thereof shall along with [SNF] agree in writing to assume each and all of the obligations of [SNF] hereunder, and to be fully bound by each and all of the terms and conditions hereof." Franke–Misal argues that since consent is conditioned upon the agreement of SNF to continue to be bound to the terms and conditions of the Agreement, and because the Bankruptcy Code, § 365(k), does not allow for the debtor or trustee to be bound, the consent to assign is vitiated.[134]

This argument overlooks several key points. First, the provision requiring SNF to agree to a continuation of liability after assignment is illusory. In some instances it is commercially wise to require continuation of liability on the part of the assignor after an assignment to a third party. However, in this instance, consent is only given if SNF is selling all or substantially all of their assets. In other words, consent is given only if SNF is discontinuing its operations and selling all that it has. Thus, if such a situation arises, SNF no longer has anything other than a name, perhaps, with which to perform its obligations or pay for liability. It is a corporate shell. It is inconceivable that the requirement that a corporate shell retain liability is the overarching cause, in the

---

133. *Rumford Chemical Works,* 109 U.S. at 81–82, 3 S.Ct. at 65.

134. § 365(k) provides:

Assignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

civilian sense, for the granting of consent to assign. In essence, the restriction is a restriction without meaning, and does not hinder such assignment by the trustee.[135]

Second, Franke–Misal's argument also overlooks the effect of § 365(f)(1) upon the contractual restriction upon transfer, given our conclusion that § 365(c)(1) is not applicable to prohibit assignment. Franke–Misal gave consent for assignment incident to a sale of substantially all of the assets of SNF. Section 365(c)(1) does not apply because consent to assign relinquishes Franke–Misal's right to be excused from performing or accepting performance from a third party. Once it is determined that applicable law does not excuse performance or acceptance of performance, the contract is viewed through the lens of § 365(f)(1) which clears the field of any purported restrictions on the trustee's right to assign. If there is no enforceable applicable law prohibiting assignment or examining the acceptance of performance, § 365(f)(1) controls the enforceability of transfer restrictions, and nullifies them.

Of course, Franke–Misal might argue that their consent is conditioned upon such continuation of liability, and without such continuation, consent is not given. The Court does not read the assignment provision of the Agreement in such a manner, and even if it did, the Court is not convinced that such a restriction could be enforced. The Agreement states that it shall not be assignable without consent. The Agreement, however, carves out a limited exception of the written consent requirement by, in effect, giving a pre-disposed consent to assignment if such assignment is incident to the sale of all or substantially all of the assets of SNF. The

language upon which Franke–Misal relies, however, does not prohibit the assignment. The consent is already given. The "in which event" language, instead, is merely a term of the contract, not a condition of consent. Moreover, it is a term of a contract that constitutes a restriction on transfer.

Franke–Misal gave unconditional consent to assign in the event that SNF sold the substantial portion of its assets. If SNF did so ("in which event"), the contract requires that SNF agree to be bound with the assignee (as the contract designates the third party, signifying that the assignment has already been accomplished) for any future performance or liability. The Court reads the provision upon which Franke–Misal relies, not as a condition of consent to assign, but rather as a condition of the contract which would support a breach claim against SNF if it failed to do so after assignment. In other words, failure on the part of SNF to execute, in writing, an agreement of continuation of liability under the contract, would not allow Franke–Misal to prevent, or even "undo," the assignment. Franke–Misal gave assent to transfer at the time of the confection of the Agreement without the necessity of further written permission at the time of such transfer (if the transfer is incident to a sale of all or substantially all of SNF's assets). Rather, such a failure on the part of SNF to agree in writing to future liability would support a claim for breach of contract on the part of Franke–Misal against SNF for any such breach liability.

It is at this point that § 365(k) intersects with the Agreement. Section 365(k) specifically renders nugatory any such pro-

---

**135.** As for the money generated by the sale of such assets, commercially reasonable people realize that if a company is unfolding and selling all its assets, it generally is doing so as part of a liquidation brought on by debt. So, such money generally would be used to pay debt and would not be available to pay for liability or to arrange for performance.

vision in the contract or in otherwise applicable law respecting future liability after assignment to a third party. Therefore, as the requirement of assumption of future liability after assignment is not a condition of consent, the consent to assign embodied in the Agreement is not abrogated by the absolution of future liability residing in § 365(k).[136]

## V. CONCLUSION

In conclusion, the Court finds that the Agreement did not terminate pre-petition, and was extant at the time of bankruptcy. Furthermore, the Court finds that while the Agreement is not an assignment of an interest in the patented process and was thus a license, Franke–Misal, nonetheless, consented to assignment of the license. Therefore, applicable non-bankruptcy law does not excuse Franke–Misal for accepting or rendering performance to a third party. Thus, the provisions of § 365(c)(1)(A) do not prohibit assignment of the Agreement. For the foregoing reasons, the Court finds that partial summary judgment in favor of the Trustee is appropriate declaring that the Agreement did not terminate prior to the petition date, was therefore assumable, and that section 365(c) does not prohibit assumption of the contract. This judgment is without prejudice to the rights of Franke–Misal to present any other defenses to assumption of the contract which have been or will be properly raised in pleadings, should be Trustee move to assume the Agreement. A separate judgment shall issue.

**136.** Before concluding, the Court pauses to address one final argument made by Franke–Misal. In its briefs, Franke–Misal argues that the Agreement encompasses not only the exclusive license of the patented process, but also consists of the provision of personal knowledge and trade secrets. Franke–Misal argues that these are "personal contracts" which cannot be assigned. The basis for this argument was the apparent fear that the Court would find exclusive licenses assignable under the rule of federal common law, and that the inclusion of another type of personal contract in the Agreement prevented assignment. However, the state law basis for Franke–Misal's argument is misplaced. Article 1766 of the Louisiana Civil Code provides that, "an obligation is strictly personal when its performance can be enforced only by the obligee, or only against the obligor." A contract for which consent to assignment is given, is not a strictly personal obligation falling with the ambit of Article 1766. The reason is simple. By agreeing to assignment, the parties are agreeing that the obligations may be enforced by or against a third party. Therefore, whether or not the terms of the Agreement regarding provision of "know-how" and personal consulting services would be strictly personal obligations standing alone, it is clear that by allowing assignment, the obligations lost their purportedly strictly personal character, and are heritable (transferable) obligations. By consenting to assignment in Paragraph 15.1 of the Agreement, Franke–Misal consented to assignment of the whole Agreement, not just the exclusive license portion thereof. Their argument is without merit.

The same reasoning applies to Franke–Misal's argument that the license itself is personal and Louisiana law (if the Federal rule of common law is against it) applies to restrict the transfer, because the license is a personal right. The consent to assign the Agreement encompasses the license portion of the Agreement as well as the "know-how" portion, and by consenting to transfer, the license loses its strictly personal character (if indeed it ever had such) because the obligations can be enforced or performed by third parties. Because the federal rule of common law and the Louisiana law on the subject lead to the same conclusion in this case, it is unnecessary for the Court to inquire as to the propriety of the development of the federal rule of common law in the *post-Erie* era, or to make an actual choice of law determination.